**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John TRICE, Defendant-Appellant.**

No. 86–1925.

United States Court of Appeals, Fifth Circuit.

July 21, 1987.
Rehearings Denied Sept. 11, 1987.

Kerry P. FitzGerald, Dallas, Tex., for defendant-appellant.

Sidney Powell, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Lynn Hastings, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before RANDALL, WILLIAMS, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant John R. Trice ("Trice") was convicted following a jury trial on three felony counts of making false statements to a financial institution insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"), contrary to 18 U.S.C. § 1014. Appellant raises several contentions in this appeal. Finding merit only in a challenge to the jury instructions, we reverse his conviction on two of the counts but affirm as to the remaining count of which he was found guilty.

I.

Appellant, an attorney, devoted most of his professional energies to petroleum industry activities until 1983, when he established a limited partnership to open and operate a sand and gravel business near Waco, Texas. Appellant and Glenn Harris ("Harris"), both from the Dallas area, were the two general partners in this enter-

prise—T&H Materials, Ltd. ("T&H"). Harris' work included managing the gravel pit, and Trice's responsibilities included arranging financing and land leasing. Trice established a $700,000 line of credit with Lancaster First Federal Savings and Loan Association ("Lancaster"), effective November 16, 1983. Lancaster was the sole limited partner in T&H. The same day the loan went into effect, initial funding of $200,000 was deposited to T&H's newly established checking account at Lancaster. Trice had exclusive control over this T&H account and dealt with Lancaster without Harris' involvement.

On November 17, 1983, the day after the loan was funded, Trice wrote a check on T&H's Lancaster account to Harris' janitorial contracting business ("Jireh") in the amount of $50,000. On the memorandum line of the T&H check, Trice indicated the check was issued for "Road Shop & Equip." Harris testified that Trice instructed him to write a $30,000 check on Jireh's account (at another bank) back to Trice the same day and to record the Jireh check as issued for legal fees, which Harris did.

On January 20, 1984, Trice gave Harris another T&H check, number 117 for $50,000, and on that same day a Jireh check was issued to Trice for $40,000, which Harris' Jireh books described as a loan to Trice. On February 17, 1984, Trice wrote T&H check number 119 to Jireh, noting on the check that it was for "Iron & steel fabrication—conveyors."[1] Another Jireh check to Trice, dated March 30, 1984 for $20,000, was recorded in Harris' books as a loan to Trice. Endorsements on the Jireh checks and appellant's personal bank account records showed that Trice deposited each of these three checks in his regular personal checking account at the Bank of Dallas.

Cecilia Johnson ("Johnson"), who was a secretary to a loan officer at Lancaster during 1983 and 1984 and who later became a loan officer there, testified at trial about appellant's dealings with Lancaster. She stated that the T&H loan "was to be disbursed in increments" and that the loan was "renewed two more times." A subsequent loan agreement, dated August 24, 1984, and a later modification agreement, dated April 4, 1985, were both admitted into evidence. Johnson testified that the initial $700,000 loan was "rolled into the new loan." These two later agreements respectively extended Lancaster's total loan to T&H to about $1.36 million, and then to some $1.55 million.

Johnson also testified that the initial lending agreement provided "that should the borrower request additional funds [above those already drawn against the loan line of credit], he was to submit to the lender *written request which consists of invoices* or receipts or bills to justify those additional funds" (emphasis added).[2]

Johnson testified that, before the amount of the loan was increased, in February 1984 Trice "furnished [Lancaster] with three invoices at our request." The invoices arrived with a "note stapled on top of the three invoices." Johnson indicated that the note was "[d]ated February 1984, but [when it was] put in the file the [day of the month] ... was punched out." The note stated:

"2/[obliterated]/84

"Dear Cece!

---

1. Although the date written on the front of check number 119 was February 17, *1983,* nine months before the T&H account was established at Lancaster, it may be inferred, from the endorsements on the check and the sequence of checks issued against and paid out of the T&H account, that T&H check number 119 was written in *1984,* rather than 1983.

2. The November 16, 1983 loan agreement stated that "Request for Advance shall mean a written request for an advance" and that such a request "shall be accompanied by copies of billing statements, vouchers and invoices ...." (Section 1.20). Counsel for appellant raised no objection at trial respecting Johnson's qualifications to interpret the loan document or to her characterization of the loan agreement as equating submission of an invoice to a request for an advance. Nor was objection made to this testimony on the ground that the jury should be permitted to consider only the agreement itself and not Johnson's characterization of its terms. Moreover, taken in full context, Johnson's testimony could properly be understood as descriptive of the parties' operating procedures and understandings with reference to the loan.

"Please put these in the T&H file. We'll need to deposit some more probably late next week.

"Thanks

"John R. Trice" [3]

Johnson identified the three invoices she said had been stapled to the note; all three were typed on identical yellow invoice forms with nonconsecutive numbers. Invoice number 8851 was dated November 17, 1983 and reflected payment of $50,000 to Jireh for "Roads & Fences, Engineer." This invoice formed the basis of count 1. The second invoice—number 8864—formed the basis of count 2. It was dated January 20, 1984 and showed that another $50,000 was paid to Jireh for "Shop foundation, electric, materials, utuilities [*sic*] erection." The third invoice—number 8887—was dated February 17, 1984 and indicated that $30,000 had been disbursed to an unidentified payee for "Iron and Steel, Steel channels, conveyor system, plant erection & labor." It formed the basis of count 3, on which Trice was acquitted. Johnson also stated that she recalled an additional $300,000 above the initial loan funding was advanced to T&H, although she was unable to identify just when this occurred.

Harris testified that the amounts reflected in these three invoices had not actually been spent for the purposes indicated on the invoices. Harris also described the origins of these invoices, stating that Trice talked to him about needing some documentation for Lancaster in February 1984:

"Q. [The Prosecutor] What did [Trice] say about that?

"A. [Harris] He said the bank wanted some invoicing to show where the money had been spent.

"Q. And what did he ask you to do?

"A. To get some invoices and fill them out so he could give them to the bank.

"Q. What did you do?

"A. I went to an office supply place, bought invoices, went to his house and we filled them out.

" . . . .

" . . . We opened a book, the invoice book, and took the first one, and then about the third through and on down into the book another one, so the numbers would not be consecutive in them, and John typed them up.

"Q. Did you watch him as he typed them up?

"A. Yes, ma'am." [4]

Johnson also testified that $240,000 was advanced to T&H on the basis of an invoice Trice submitted reflecting that T&H had paid $230,000 to purchase equipment (a "dragline") from Rector Equipment Company ("Rector Equipment") on or about September 14, 1984. This invoice formed the basis of count 4. Don Rector testified that his company sold the dragline for $180,000 to Trice, acting for T&H, but that appellant asked Rector to prepare an invoice showing a price of $230,000, that appellant wrote a $230,000 T&H check to Rector Equipment, and that Trice asked for and received a $50,000 "commission" check back from Rector on the day the sale was finalized.

Banking records showed that appellant deposited the $50,000 Rector Equipment check into the "Trice Minerals" account at the First Security Bank and Trust in Coppel, Texas on September 17, 1984, purchased a $50,000 forty-five-day certificate of deposit from that bank on that same day, and on November 5, 1984, after the certificate had matured, deposited the re-

---

3. The note itself was introduced into evidence as an exhibit. Johnson read the note as stating "we would need to deposit some more." Again, appellant's counsel voiced no objection to this testimony characterizing the contents of the writing. Moreover, in context, it can be understood to refer to the parties' understandings and operating procedures.

4. Harris testified that this pad of blank four-part invoice forms (each invoice consisted of four identically numbered duplicate copies—in white, yellow, pink, and goldenrod) was later used to bill for T&H sand and gravel sales. Harris' invoice log, containing the yellow copy of each T&H invoice, was offered into evidence and lacked yellow copies of invoices 8851, 8864, and 8887, but included goldenrod copies of these invoices marked "void" but otherwise blank.

sulting principal and interest ($50,693.49) into his personal account at the Bank of Dallas.

Appellant was indicted on four counts of having made false statements to a federally insured institution in violation of 18 U.S.C. § 1014. Each count of the indictment described a different invoice, but all counts alleged:

"JOHN TRICE, Defendant, for the purpose of influencing the action of Lancaster ..., the accounts of which were insured by the [FSLIC], knowingly and willfully made a material false statement in conjunction with a request for advance of loan proceeds to T&H Materials, Ltd., in that ... [he] submitted an invoice representing that the loan proceeds were for [quoting the pertinent invoice], when in truth and in fact ... he had taken part of said loan proceeds for his personal use.

"A violation of Title 18, United States Code, Section 1014."

Counts 1, 2, and 3 related to appellant's submission to Lancaster of the three invoices on or about February 17, 1984.[5] Count 4 charged that appellant had violated section 1014 by submitting the dragline purchase invoice on or about September 14, 1984.

The jury found appellant guilty on counts 1, 2, and 4, and acquitted him on count 3. Appellant was sentenced to concurrent two-year terms of imprisonment on counts 1 and 2, and given a suspended sentence with five years' probation on count 4 (he was also ordered to pay a $50 special assessment on each of counts 1, 2, and 4).

## II.

The statute under which appellant was charged provides in pertinent part:

"Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of

... any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $5,000 or imprisoned not more than two years, or both." 18 U.S.C. § 1014.

■ Proving a violation of section 1014 requires showing beyond a reasonable doubt that the financial institution to which the false statements were made was enrolled in a federal account insurance program, and that:

"(1) the defendant made a false statement to a financial institution;

"(2) the defendant made the false statement knowingly;

"(3) he did so for the purpose of influencing the financial institution's action; and

"(4) the statement was false as to a material fact." *United States v. Thompson*, 811 F.2d 841, 844 (5th Cir.1987). There is no requirement that the government prove the defendant *succeeded* in influencing the financial institution's decision:

"'[T]he essence of a [section] 1014 offense is the making of the false statement with the *intent* to influence the lender, and it is not dependent upon the accomplishment of that purpose. It is a crime of subjective intent requiring neither reliance by the bank officers nor an actual defrauding.'" *Id.* at 843 (emphasis in original; citations omitted).

■ Each distinct false statement is a separate offense even if there is only one loan or advance. *See United States v. Davis*, 730 F.2d 669, 671–72 (11th Cir.1984) (holding that each false document forms

---

**5.** Count 1 described the November 17, 1983 invoice as one "representing that the loan proceeds were for 'Roads, fences, and engineer'"; count 2 described the January 20, 1984 invoice as an invoice for "'Shop foundation, electric,

materials, utilities erection'"; and count 3 described the February 17, 1984 invoice as one for "'Iron and steel, steel channels, conveyor system, plant erection, and labor.'"

the basis of a separate offense charge). We have also held that a false statement or report for purposes of section 1014 can include the failure to disclose material information needed to avoid deception in connection with a loan transaction. *United States v. Greene*, 578 F.2d 648, 657 (5th Cir.1978), *cert. denied*, 439 U.S. 1133, 99 S.Ct. 1056, 59 L.Ed.2d 96 (1979).

### III.

Appellant asserts on this appeal in substance that: (1) the evidence was insufficient to sustain his conviction on each count, both because there was no proof that Lancaster was a federally insured financial institution and because there was no evidence the invoices were submitted "in conjunction with a request for advance of loan proceeds," as charged in each count; and (2) the jury charge was deficient in respect to the indictment's allegations concerning loan advances, principally by not requiring the jury to find that the action of Lancaster which appellant intended to influence by submitting the false invoices was its action upon a loan *advance*.

### A. Sufficiency of evidence

Reviewing claims that evidence was insufficient to support the jury's verdict, we view the evidence as a whole and the inferences that can be drawn therefrom in the light most favorable to the verdict, and then determine whether a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Saenz*, 747 F.2d 930, 935–36 (5th Cir.1984), *cert. denied*, 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985); *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

#### 1. Lancaster's federally insured status

██ A jurisdictional element which the government must prove beyond a reasonable doubt in a prosecution under section 1014 is that the accounts of the financial institution were, at the time of the offense, insured by the appropriate federal agency. *E.g., United States v. Platenburg*, 657 F.2d 797, 799 (5th Cir.1981); *see also* 18 U.S.C. § 1014 ("the accounts of which are insured by the Federal Savings and Loan Insurance Corporation"). Decisions analyzing other statutes embodying this same jurisdictional element are directly relevant. *E.g., United States v. Rangel*, 728 F.2d 675 (5th Cir.), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2689, 81 L.Ed.2d 883 (1984); *United States v. Maner*, 611 F.2d 107 (5th Cir. 1980).

We have written that "one simple method of proof would be to introduce the certificate of insurance issued by the [appropriate federal agency], the contract of insurance between the bank and the [federal agency], and the cancelled check [for the federal insurance premiums] for the period of time covering the [time of the offense]." *Maner, supra*, at 112 n. 2. Although we have held insufficient proof based solely on a certificate of federal insurance issued seven years before the offense, *see Platenburg, supra*, at 800, we have accepted—albeit with reluctance—as barely sufficient an FSLIC certificate demonstrating pre-offense coverage together with the testimony of bank officials that such coverage was in effect when the offense occurred, *id.* at 799 & n. 2.

We have also held that evidence of insured status antedating the time of the offense, coupled with evidence of insured status *at the time of trial*, permits an inference that coverage had continued uninterrupted through the time of the offense. *United States v. Fitzpatrick*, 581 F.2d 1221, 1223 (5th Cir.1978); *see also Platenburg, supra*, at 800 & n. 4 (discussing *United States v. Brown*, 616 F.2d 844 (5th Cir.1980) (finding that a telegram indicating beginning of coverage and testimony that current premiums had been paid were "sparse" but sufficient evidence)).

The only evidence of Lancaster's insured status was provided by Johnson, who testified that she had made a copy of the FSLIC certificate hanging in her place of employment shortly before the time of trial (October 27, 1986). This certificate, dated July

19, 1985, indicated that the accounts of "Southern Federal Banc Savings and Loan Association" were protected by such insurance as of that date. A notation at the bottom of the certificate stated, "Originally Issued August 8, 1962."

Johnson testified that she began work at "Lancaster First Federal Savings and Loan" in June 1983, and that the institution had been renamed "Southern First Federal Savings and Loan" in July 1985. The following exchange then occurred (emphasis added):

"Q. [Prosecutor] Are the *accounts and deposits* of Southern Federal Savings and Loan insured by the Federal Savings [and] Loan Insurance Corporation?

"A. [Johnson] Yes, they are.

"Q. And back in 1983 and 1984, were the *deposits* of Lancaster First Federal Savings and Loan Association *also* insured by the Federal Savings [and] Loan Insurance Corporation?

"A. Yes they were."

■ Appellant complains on appeal—having raised this issue for the first time in his post-verdict motions for a new trial or acquittal n.o.v.—that the certificate related to one institution ("Southern Federal *Banc* ") and Johnson's testimony to two other entities ("Southern Federal Savings" and "Southern *First* Federal Savings"). He also contends that Johnson's testimony, even if it adequately identified only one financial institution, stated that the *deposits* of Lancaster were insured, and not the "accounts" as required by section 1014.[6]

■ Our review of the record indicates that the jury could have concluded that Johnson's testimony, together with the FSLIC certificate, proved beyond a reasonable doubt that Lancaster's accounts were

federally insured during the period when these offenses occurred. There is certainly no suggestion to the contrary in the record. Despite the discrepancies to which appellant now points, the certificate indicated that it had been originally issued in 1962, the year Johnson testified Lancaster opened; the certificate reflected that FSLIC insurance existed for the named institution's "accounts" in July 1985, when the certificate was reissued. The jury may have inferred—absent evidence to the contrary—that coverage had continued without interruption since 1962.

In addition, Johnson testified that the certificate came from the institution in which she worked, and that this same institution had operated under the "Lancaster" name during the period in question. Furthermore, although Johnson answered affirmatively when the prosecutor asked whether Lancaster's "deposits" had been insured during 1983 and 1984, she also answered affirmatively when asked if the certificate stated "they are so insured," suggesting that she viewed the word "accounts" (which appeared on the FSLIC certificate) and the word "deposits" (used by the prosecutor) as synonymous for purposes of FSLIC coverage. *Cf. Rangel, supra,* at 676 & n. 1. In the absence of any evidence even suggesting the contrary, we conclude that the evidence offered—although less than we have repeatedly urged the prosecution to produce in an abundance of caution, *see Platenburg, supra; Maner, supra*—was nevertheless sufficient to permit the jury to find beyond a reasonable doubt that Lancaster was an FSLIC-insured institution when the charged offenses occurred.

## 2. Advance of loan proceeds

In raising this sufficiency question, appellant groups his convictions on counts 1

---

6. Neither Johnson's testimony itself nor other evidence showed the basis of Johnson's knowledge concerning Lancaster's insured status; nor was there any indication that she was not in a position to have personal knowledge of this. *See Maner, supra,* at 110 (discussing the validity of objections to testimony about an institution's insured status if the testimony is offered by a bank official who lacks personal knowledge of that status). Counsel for appellant, however, did not object to Johnson's testimony about insured status at the times of these offenses by challenging the basis of her purported knowledge. The jury was therefore entitled to consider her unchallenged testimony. *See United States v. Johnson,* 577 F.2d 1304, 1312 (5th Cir. 1978). *Cf. United States v. Davis,* 792 F.2d 1299, 1304 (5th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986).

and 2, and discusses separately his conviction on count 4.

 Appellant's argument concerning the sufficiency of the evidence on count 4 centers on his claim that there was no written request for an advance distinct and separate from the dragline invoice itself, as he contends the loan agreement required. Although appellant correctly claims that the written loan agreement described a more formal method by which he was to request that loan proceeds be disbursed or advanced by deposit to the T&H account, the jury had heard Johnson's uncontroverted testimony that the submission of an invoice constituted a request for an advance under the loan. *See* note 2, *supra.* Even if the written loan agreement set out a more formal method for requesting advances, the jury was entitled to conclude that Lancaster had waived such formalities in dealing with appellant. More importantly, for purposes of section 1014 the relevant question for the jury was whether appellant's submission of the invoices was intended to influence Lancaster's action upon any advance under the loan, and not whether the submission of the invoices complied with the procedures described in the loan agreement. We therefore find this contention meritless. We note that appellant does not dispute Johnson's testimony that a specific $240,000 advance of loan proceeds followed immediately after and as a direct consequence of appellant's submission of the $230,000 dragline invoice. The jury could reasonably infer that appellant's intent in submitting this invoice was to influence Lancaster to make the $240,000 advance on the loan. We reject appellant's claim that the evidence was insufficient as to count 4.

With respect to his claim that the evidence on counts 1 and 2 was insufficient, appellant argues that the government failed to show any advance of funds or any specific later decision to advance funds that could have been influenced by the invoices submitted in February 1984. Therefore, he argues, the fact that falsified invoices had been filed does not come within the prohibition of section 1014 because there was no showing that appellant intended to influence any decision to advance loan proceeds, as charged by the indictment. *Cf. United States v. Brown,* 674 F.2d 436 (5th Cir. 1982).

Appellant correctly points out in this connection that the government did not produce a comprehensive and detailed account of the flow of loan proceeds to T&H between February 1984 and the fall of 1984, when approved funding for the loan was increased to $1.36 million (in August) and the dragline invoice was submitted (in September). Furthermore, Johnson testified that she recalled no occasion on which appellant submitted a formal request for loan proceeds, and her testimony that $300,000 was disbursed above the initial loan funding failed to specify whether this occurred before or after the invoices were submitted in February, or before or after the loan was renegotiated in August. Although Johnson testified that she placed the February invoices into appellant's file, she also stated that she did not make lending or loan advance decisions and that she did not know if any Lancaster official ever examined the invoices. In sum, appellant's contention is that the government did not clearly show that Lancaster made or even had reason to make any decisions about advances in the six-month interval between February and August 1984 or that appellant knew any decisions on advances were to be made, and, *a fortiori,* that the government failed to prove appellant intended to influence any decision in that time period.

 We reject this contention. The evidence allowed the jury to conclude that only $200,000 of the $700,000 loan amount was disbursed on or about November 16, 1983, leaving $500,000 thereafter available. Moreover, Johnson's testimony showed that an additional $300,000 was advanced, although she did not specify when. Even if it were assumed that all $300,000 was advanced prior to February, this would still have left $200,000 then available for advance under the $700,000 loan. That the loan was for $700,000 suggests that ad-

vances of more than $500,000 were contemplated. This inference also tends to be supported by the fact that the loan amount was increased in August 1984. In addition, the jury could have reasonably concluded that the most plausible reading of the note to which appellant attached the three invoices submitted in February was that he was calling for the deposit of additional loan funds, or, at the least, that he was advising that he would be requesting additional loan funds and was laying the groundwork for such a request. Furthermore, Johnson testified that the "loan was to be disbursed in increments" and that appellant's submission of these invoices "would substantiate his use of the funds and would allow him to draw more funds." [7] Taken as a whole, the evidence indicates that Trice's submittal of the invoices contemplated, and was intended to influence Lancaster's action on, some further advance of loan proceeds. The jury could properly find that appellant's submission of the invoices was intended to influence Lancaster's action with respect to *some* further advance of proceeds under its loan to T&H, even though there was no identification of one specific particular contemplated advance thereunder to which Trice intended his submittal of the invoices to relate. We do not read either section 1014 or the instant indictment as requiring more than this.

Section 1014 proscribes false statements for the purpose of influencing action "upon *any* ... advance" (emphasis added). Counts 1 and 2 do not identify any one particular or specific advance Lancaster's action on which Trice intended to be influenced by his submittal of the false invoices. Proving the charges alleged by the indictment did not require the government to show that Trice, when he submitted the invoices, had in mind some particular or specific contemplated advance under Lancaster's loan to T&H. While the indictment does allege that the invoices were submitted "in conjunction with a request for" advance, we regard the quoted language as surplusage insofar as it alleges more than that appellant had, in the words of the indictment, "the purpose of influencing the action of Lancaster" on an advance under its loan to T&H when he submitted the false invoices. The words "request" and "in conjunction with" do not appear in section 1014. It is no part of the offense proscribed by section 1014 that the false statement be "a request for" an advance or that it be made "in conjunction with" either an advance or a request for same. All that section 1014 requires in this regard is that the false statement be made "for the purpose of influencing in any way the action of" the specified financial institution "upon any ... advance." [8]

---

**7.** As Harris testified, Trice had the false invoices made up because "the bank wanted some invoicing to show where the money had been spent." The invoice in count 1 related to an expenditure purportedly made about the time when the initial $200,000 was advanced, some three months *before* the invoice was submitted; the invoice in count 2 related to an expenditure purportedly made about one month *before* the invoice was submitted. Thus, while it appears that an advance for payment of these particular invoices was not being sought by their submittal, nevertheless, as Johnson testified, submitting the invoices substantiated appropriate use of previous disbursements under the loan and thus would allow Trice to draw more funds on it, and the accompanying note indicated that Trice was requesting or intended to request further disbursement.

**8.** Surplusage in an indictment may generally be disregarded where the charge is not materially broadened and the accused is not misled. *See United States v. Miller,* 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *Fretz v. United States,* 140 F.2d 468 (D.C.Cir.1944); *United States v. Ramirez,* 670 F.2d 27, 29 (5th Cir.1982); *United States v. Coward,* 669 F.2d 180, 183–84 (4th Cir.), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 470 (1982). *See also United States v. Parkhill,* 775 F.2d 612, 615 (5th Cir. 1985). Here there was no broadening and there was ample notice: the indictment adequately and correctly (as shown by the evidence) identified the invoices, the respect in which each was false, the time of their submission, and the loan in regard to which they were submitted and Lancaster's action on an advance under which was intended to be thereby influenced; and, as above-noted, the indictment did not identify and purport to be limited to any specific or particular advance under that loan.

Accordingly, we hold that the evidence was sufficient as to counts 1 and 2, as well as to count 4.[9]

### B. Jury instructions

■ The district court charged the jury in relevant part as follows (emphasis added):

"Under the bank fraud statute each false statement made knowingly in distinct and separate documents for the purpose of influencing in any way the action of any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, *upon any application, advance, commitment, or loan, or any change or extension of any of the same,* constitutes a separate offense.

"In order to establish that a defendant is guilty of making a false statement to a federally insured savings and loan institution, the Government must prove beyond a reasonable doubt that:

"1. The defendant knowingly made a false statement or report concerning a material fact to an insured institution, and

"2. That the Defendant made the false statement or report willfully and with intent to influence in any way the action of the insured institution *upon any application, advance, commitment or loan, or any change or extension of any of the same.*"

Appellant's objections to this portion of the charge included the following (emphasis and footnote added):

"THE COURT: ... [Y]ou have each received a copy of the Court's charge.... So does anyone want to make any objections at this time?

"MR. NEIL [trial counsel for appellant]: Your Honor, at this time the only thing that I would submit to the Court is that it's a very good charge. However, it omits those cases we submitted to the

Court with respect to advance.[10] And *I think advance is a very necessary and pertinent part of this case. The indictment charges advance and the charge omits requests for advance and definitions of such.* And I think it's material to the defense that such a definition be included. And that is the only objection that I would give to the Court's charge.
"....

"THE COURT: Very well. The objection is overruled ...."

All four counts of the indictment charged that appellant knowingly submitted the false invoices "for the purpose of influencing the action of Lancaster" upon *"advance of loan proceeds to T&H Materials, Ltd."* (Emphasis added.) The jury was instructed, however, in paragraph "2" of the above-quoted charge, that the government need only prove

"[t]hat the Defendant made the false statement or report willfully and with intent to influence in any way the action of the insured institution *upon any application, advance, commitment or loan, or any change or extension of any of the same."* (Emphasis added.)

The plain language of the charge advised the jury that it could convict appellant for making a false statement with the intent to influence, *inter alia,* "any change or extension" of a loan. Thus, a basis for conviction was presented as an alternative to a conviction based on statements intended to influence action upon "any ... advance."

Although no language in the indictment had charged appellant with the purpose of influencing action upon any extension or amendment of a loan, the jury had heard evidence that Lancaster's loan to T&H had been "change[d] or exten[ded]" after the submission of the invoices.

---

**9.** The evidence is ample that the invoices on counts 1 and 2, like that on count 4, were known by Trice to be materially false when he submitted them, and the sufficiency of the evidence is not challenged on this basis.

**10.** We are unable to determine on appeal the precise thrust of this part of the objection because appellant's attorney failed to preserve any record of these "cases ... submitted ... with

respect to advance," although he referred to such cases on more than one occasion. The transcript of trial proceedings and appellant's pretrial and trial filings contained in the record cite no cases on this subject, and the docket sheet does not indicate any memorandum of law was offered in that respect; nor does the record contain any requested charge, instruction, or definition submitted by appellant.

■ These circumstances bring the present appeal within the rule of cases such as *United States v. Bizzard*, 615 F.2d 1080 (5th Cir.1980), and *United States v. Ylda*, 653 F.2d 912 (5th Cir.1981). Under these decisions, the expansion of the scope of an indictment through jury instructions becomes "reversible error if it is possible that the defendant was tried and convicted for a crime other than that alleged in the indictment." *Ylda, supra*, at 914. The objection appellant raised to the jury instruction below, despite its lack of precision,[11] was minimally sufficient to alert the district court to the defect in the charge. Indeed, after hearing appellant's suggestions, the district court remarked,

> "I do have some concerns in the area where a specific—where the indictment treats a request for an advance, but does not really show that to be an action that the defendant wished the bank to take. So there may need to be some explanation in there and I will have to look at it in that light."

After this colloquy, however, the instruction was given to the jury unaltered.

■ As we have discussed, there was no evidence of any particular specific advance to which the submittal of the invoices alleged in counts 1 and 2 related.[12] On the other hand, there was definite evidence of a particular specific renegotiation and change of the loan made in August 1984 after the counts 1 and 2 invoices were submitted in February of that year. We cannot say with certainty that the jury did not convict appellant on counts 1 and 2 on the theory that his false statements were intended to influence Lancaster's action in changing the loan by increasing and renewing it, a theory permitted by the instruction but not alleged in the indictment.

As for count 4, however, we find no reasonable possibility that the jury convicted appellant of any offense other than the charge alleged by the indictment. The clear and uncontroverted evidence relevant to this offense showed that in September 1984 Lancaster had advanced $240,000 immediately after and as a direct consequence of the submission of the padded $230,000 dragline invoice. *See Ylda, supra*, at 913–15 (holding that reversal is not required if a review of the evidence shows that there is no possibility the jury could have convicted the defendant of an offense described in the instruction but not alleged in the indictment).[13]

---

11. Although the objection raised by appellant's counsel was not a model of clarity, we believe that the objection was minimally sufficient to apprise the court of the flaw in the instruction when taken together with other comments—albeit somewhat unclear in themselves—that had been made by counsel a few minutes earlier when the district court entertained "suggestions" to the charge. These comments included (emphasis added):

> "[T]he charge is ... pretty boiler plate, but in this particular situation it's a little different.... *[I]t's predicated upon a request for advance as the four count indictment says....*
>
> "... [S]ince the indictment goes directly to request for advance, and, of course, being an invoice, that there should be a definition of request, and I think that under request a definition of what an advance is, because when you receive any false applications and any false income statements, and where these advances are actually made *there is a variance between the counts and the charge and what's been presented to the jury when they were voir dired and when the indictment was read to them.*"

Although the question here is close, we determine that counsel's objections to the charge met—albeit barely—the standards of Rule 30,

Fed.R.Crim.P. (to preserve instructional error, a defendant must "stat[e] distinctly ... the grounds of his objection").

12. The district court indicated its own dissatisfaction with the clarity of the evidence on advances, remarking when ruling on appellant's motion for a new trial:

> "The Court will state that had the Court been the trier of fact in this case, the Court probably would be unable to say that the Court was convinced beyond a reasonable doubt as to whether or not advances had been made based upon representations that the defendant made to the savings and loan.
>
> "However, the Court wasn't the trier of fact, and the Court is not going to substitute its judgment for the trier of fact; that is, the jury."

13. We observe that the charge did not allow conviction "upon a set of facts distinctly different from that set forth in the indictment," *United States v. Young*, 730 F.2d 221, 223 (5th Cir. 1984), as is pointed out in note 8, *supra*. Nor did it substitute a different jurisdictional basis for the offense. *See United States v. Fitzpatrick*, 581 F.2d 1221 (5th Cir.1978).

We hold that the charge was erroneous in the above-noted respect, and that this error requires reversal for retrial as to counts 1 and 2, but that the error was not prejudicial as to count 4 and does not require reversal of the conviction under it.[14]

## CONCLUSION

Accordingly, appellant's convictions on counts 1 and 2 are reversed and remanded for another trial. His conviction on count 4 is affirmed.

AFFIRMED in part and REVERSED in part.

---

**14.** Appellant also asserts that the court's charge was deficient because it failed to define "advance." We reject this contention. " '[T]erms which are reasonably within the common understanding of juries, and which are not technical or ambiguous, need not be defined in the trial court's charge,' " although the court must (at least on adequate request) define a term when its proper meaning in the case is "a rather esoteric meaning." *United States v. Anderton,* 629 F.2d 1044, 1048–49 (5th Cir.1980). We have rejected appellant's contention that "advance" must be restricted to a loan disbursement *pursuant* to an application for same that was in all respects in conformity with the written loan agreement. To the contrary, under section 1014 "advance" has no technical or restricted meaning in this context. In the trial of this case, the term "advance" had been used innumerable times in the presentation of evidence and in jury argument. From the appearance of Johnson as the first witness until the end of the trial, the term was consistently used to describe the disbursement of loan funds from Lancaster to T & H. This was its proper meaning for purposes of section 1014. There is no suggestion of any other meaning the jury could have attached to the term "advance" (other than the above-referenced improper meaning which appellant has argued). As the cases cited in *Anderton, supra,* at 1049, make clear, the district court did not abuse its discretion in failing to define "advance" here. *See also United States v. Fischel,* 686 F.2d 1082, 1087–89 (5th Cir.1982).