**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Benjamin C. McCLELLAND,**
**Defendant–Appellant.**

**No. 87–1767.**

United States Court of Appeals,
Fifth Circuit.

March 14, 1989.

John W. Sweeney, Jr., Fort Worth, Tex., court appointed, for defendant-appellant.

Frederick M. Schattman, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before BROWN, JOHNSON and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellant, Benjamin Casey McClelland, appeals his conviction on a single count of bank fraud and three counts of mail fraud.[1] We find no error and affirm.

## I.

Appellant's conviction on one count of bank fraud and three counts of mail fraud stem from two events related to his operation of Casey's Restaurant, a business McClelland owned. The bank fraud conviction arises from a $3,800 loan McClelland obtained from Western National Bank of Fort Worth to buy a donut fryer for the restaurant. The government introduced evidence showing that McClelland submitted documents in support of his loan application that he represented to be true copies of quarterly sales tax returns from the restaurant. The documents turned out to be forgeries.

---

**1.** The jury acquitted McClelland on one count of arson. He was also acquitted of two counts of mail fraud stemming from an unrelated house fire and one count of conspiracy to commit mail fraud.

In December 1986 an explosion occurred at Casey's Restaurant which resulted in the destruction of the restaurant and other nearby buildings. The mail fraud counts arise out of McClelland's attempt to recover the proceeds of a fire policy issued by Western Lloyd's Insurance Company insuring Casey's Restaurant. The government proceeded against appellant on the theory that he intentionally destroyed Casey's Restaurant for the purpose of collecting on the fire policy.

The primary issues on appeal focus on McClelland's conviction on the mail fraud counts, Counts 3, 4 and 5, and more particularly on the character of the letters sent through the mails on which the convictions were predicated.

McClelland challenges the sufficiency of the evidence to support his conviction on all counts. We will now turn to a consideration of McClelland's specific arguments.

## II. THE MAIL FRAUD COUNTS

■■■ The mail fraud statute declares it a federal crime to use the mail in furtherance of a scheme to defraud or to obtain money by false pretenses.[2] Each separate use of the mails to further a scheme to defraud is a separate offense. To convict, the government must establish (1) a scheme to defraud (2) which involves a use of the mails (3) for the purpose of executing the scheme. *United States v. Kent,* 608 F.2d 542, 545 (5th Cir.1979). McClelland attacks the sufficiency of the government's evidence in two respects: (1) failure of the government to establish the existence of a scheme to defraud or obtain money by false pretenses and (2) failure of the government to establish that the mailings on which Counts 3, 4 and 5 are predicated, were "for the purpose of executing" such a scheme or artifice to defraud.

### 1.

■■ The government's evidence of McClelland's scheme to defraud or obtain

money by false pretenses was overwhelming.

Viewing the evidence as we must in the light most favorable to the verdict, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Thompson,* 811 F.2d 841, 844 (5th Cir.1987), the facts the jury was entitled to find are as follows:

McClelland opened Casey's Restaurant in leased premises in Fort Worth, Texas, in 1985. He insured the premises for $15,000 in October of 1985. But in October of 1986 the appellant, after cancelling his initial policy, insured the premises for a total of $53,000 through Western Lloyd's. Within a month after this insurance attached, McClelland told his sister of his plans to destroy Casey's Restaurant so that he could collect the proceeds of the insurance and repay money he had borrowed from his father. McClelland's sister testified that McClelland told her that he planned to disconnect a vent-a-hood and cause it to fall on a gas line and create an explosion in the neighboring restaurant—Santini's. McClelland then told his sister that he had determined that it was too difficult to create an explosion in this fashion and that he had decided to disconnect a gas line in Santini's so that gas would collect in that restaurant and cause an explosion that would destroy his restaurant as well as Santini's. The evidence revealed that the explosion occurred just as McClelland had told his sister it would.

After the explosion, McClelland contacted the insurance adjuster handling his claim and provided him with an inventory that was grossly inflated, both as to the value of the leasehold improvements and the value of the equipment destroyed in the explosion. The evidence is clearly sufficient to support the government's theory that McClelland executed a scheme to defraud his fire insurer.

---

**2.** 18 U.S.C. § 1341 provides in pertinent part: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the pur-

pose of exe⸱ ⸱ting such scheme or artifice or attempting so to do ... knowingly causes to be delivered by mail ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**2.**

McClelland next challenges the sufficiency of the evidence to establish that the mailings on which Counts 3, 4 and 5 are predicated were "for the purpose of executing such [fraudulent] scheme or artifice."

■ By way of background, it is well established that an accused causes a letter to be delivered by mail if he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where he can reasonably foresee that use of the mails will result. *United States v. Shaid,* 730 F.2d 225, 229 (5th Cir.1984). The government need not prove that the accused used the mails himself or actually intended that the mail be used. *United States v. Contenti,* 735 F.2d 628 (1st Cir.1984); *United States v. Moss,* 591 F.2d 428 (8th Cir.1979).

But the government must prove that the mailing was "for the purpose" of executing the scheme. The Supreme Court in *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), held that the government, to establish this element must demonstrate a "sufficiently [close]" relationship between the mailing and the scheme. The Court in *Maze* concluded that the mailings at issue in that case were not covered by the statute because they did not further the defendant's scheme. *See United States v. LaFerriere,* 546 F.2d 182 (5th Cir.1977). In *United States v. Kent,* 608 F.2d 542 (5th Cir.1979), we gave a more expansive explanation of the relationship the mail fraud statute requires between the mailing and the fraudulent scheme:

> The requisite statutory purpose exists if the alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails, ... and if the use of the mails was "an integral part of

the scheme to defraud,".... This test of dependence does not demand that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that "the success of the scheme actually depended on the mailings in a 'but for' sense." ... It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way "incident to an essential part of the scheme."

*United States v. Kent,* 608 F.2d 542, 546 (5th Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980) (citations omitted).

We now consider the individual mailings on which Counts 3, 4 and 5 were predicated.

■ Count 3 was predicated on a letter mailed by McClelland's insurance agent to Western Lloyd's general agent for the purpose of obtaining coverage. That letter enclosed McClelland's application for insurance on Casey's Restaurant. This is obviously an essential step to procure the insurance coverage. Consequently, the jury was entitled to find that this mailing furthered McClelland's scheme to make a fraudulent insurance claim.

■ The mailing in Count 4 is predicated on a letter from the field adjuster, Mr. Murrell, to McClelland. Before this letter was mailed, McClelland delivered a typed list of an inventory of the lost contents of Casey's Restaurant. Mr. Murrell testified that before he posted the letter on January 6, 1987, he told McClelland by telephone that he needed supporting documentation of the lost contents in the form of receipts, invoices and similar documents. Mr. Murrell's letter, which is reproduced in the margin,[3] confirmed his earlier telephone re-

---

**3.** The text of the letter read as follows:

Dear Mr. McClelland:

We have previously advised that we need copies of records, invoices, and other information in order to properly document your loss. We would request that you provide us with copies of invoices for purchases of equipment as indicated in your inventory of December 13, 1986, a copy of which we attach.

We also need copies of receipts for material and work performed in lease improvements included in this same inventory.

In addition, we would request that you provide us with copies of current financial statement and sufficient information to verify same.

Should you have any questions regarding this, please do not hesitate to contact us. This

quest for documentation to support McClelland's claim. A copy of McClelland's inventory was attached to the letter. The jury was entitled to conclude that Mr. Murrell's letter to McClelland was for the purpose of obtaining the proper documentation for McClelland's loss so that the claim could be processed. No one who makes a claim on a fire policy could reasonably expect an insurer to make payment without some documentation of what items were lost in the fire and the value of those items. We are satisfied that the jury was entitled to conclude that Murrell's request through the mails for this supporting documentation furthered an essential element of McClelland's scheme: to obtain payment on the claim. *See United States v. Draiman*, 784 F.2d 248, 253 (7th Cir.1986).

 The mailing relied on by the government in Count 5 is a detailed interim report from Mr. Murrell, the field adjuster, to the claims department of Western Lloyd's Insurance Company. The report is obviously designed to give Western Lloyd's claims department the details of the field adjuster's findings relative to the insured's claim. Mr. Murrell attached a number of documents to the report, including photographs of the damaged area, newspaper articles about the explosion and the typed inventory of contents furnished by McClelland. The report also includes routine information Western needed to decide whether to pay the claim. In addition to the attachments described above, the report outlined the nature of the business, the likely value of the contents and improvements, the origin and cause of the explosion and whether the company has prospects for subrogation or salvage. Although Mr. Murrell did not directly accuse McClelland of complicity in the arson that destroyed the restaurant, he reported facts that would lead the claims department to suspect that McClelland was involved in it. For example, Murrell reported that McClelland had been questioned by the local police department and by federal authorities; McClelland's claim was inflated; McClel-

land's records had been seized by the treasury department; when investigators from the federal agency and the local police attempted to question McClelland he became upset and hired counsel.

McClelland, citing *United States v. Castile*, 795 F.2d 1273 (6th Cir.1986), argues that this mailing was not "for the purpose" of executing the scheme because of the suspicion it tended to cast on McClelland. In *Castile*, the mail fraud prosecution was predicated on several letters between an insurance adjuster and counsel hired to direct an investigation to determine the cause of a fire. The letters focused on the active investigation that was in progress to support a denial of Castile's fire claim. The letters referred to leads that would tend to support that conclusion. The court found that these letters were directed to the investigation of the cause of the fire and the detection of Castile's scheme. *Id.* at 1280. As a result, the court determined that the purpose of the letters was to defeat Castile's scheme rather than further it. *Id.*

In *LaFerriere*, 546 F.2d at 187, we reversed a mail fraud conviction based on a letter demanding payment that was sent to the defendant by a fraud victim's attorney. We held that the mailing could not be in furtherance of the scheme because "[t]he *only* likely effect of the ... letter would be to further detection of the fraud or deter its continuance." *LaFerriere*, 546 F.2d at 187 (emphasis added).

Unlike the letters relied on by the government in *Castile* and *LaFerriere*, Murrell's report was not for the sole purpose of defeating McClelland's claim. Most of the facts contained in Murrell's report are routinely used by insurers in making decisions on whether and how much to pay on an insurance claim. Consequently, Mr. Murrell's interim report was a customary step in processing an insurance claim. The jury was entitled to conclude that this mailing furthered McClelland's

will confirm our previous verbal requests regarding this information.

Yours very truly,
Thom Murrell,
Property Supervisor

scheme to collect on his fraudulent insurance claim.

## III. THE BANK FRAUD COUNT

McClelland was convicted of bank fraud pursuant to 18 U.S.C. § 1344.[4] He attacks this conviction on two grounds. First, McClelland contends there was insufficient evidence as a matter of law of the federally insured status of the bank.

■ James Laudermilk testified that he was a vice president and loan officer at Western National Bank during the relevant period. He further testified, without objection, that at all times during that period the Western National Bank was insured by the FDIC. This evidence was properly before the jury and it was a sufficient basis from which the jury could reasonably find that the bank was insured. See *United States v. Trice*, 823 F.2d 80 (5th Cir.1987).

McClelland next contends that the evidence was insufficient to support a finding that McClelland had a scheme to defraud the bank. McClelland sought a $3,800 loan from the Western National Bank of Fort Worth to buy a donut fryer. McClelland gave the bank what he said were true copies of Casey's quarterly sales tax returns as verification of his sales. But the evidence established that these documents were bogus. McClelland argues he made no material misrepresentation because, as it turned out, the sales figures provided to the bank in the forged returns were probably more accurate than the figures that would have appeared in the actual sales tax returns. We reject McClelland's contention.

■ Loan officer Laudermilk testified that he relied on the forged documents in making the loan. The terms "scheme" and "artifice" are defined to include, among other things, any fraudulent pretenses or misrepresentations intended to deceive others to obtain something of value, such as money, from the institution to be deceived. See *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987) (citing *United States v. Toney*, 598 F.2d 1349, 1357 n. 12 (5th Cir.), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980)). McClelland forged documents and presented them to the bank as actual returns showing true sales figures to motivate the bank to make the loan. Thus, a jury could have found that McClelland engaged in a scheme or "artifice" to defraud as contemplated by the bank fraud statute.

For the reasons discussed above, we affirm the judgment of the trial court.

AFFIRMED.

JOHN R. BROWN, Circuit Judge, concurring in part and dissenting in part.

I concur but with great reservation on the mail fraud convictions but dissent as to the bank fraud conviction.

### Mail Fraud

I concur without reservation as to Counts 3 and 4. Although neither of these letters contained anything which was untrue, deceptive or a misrepresentation—indeed, each was innocuous in its own terms—each was "for the purpose of executing [the] scheme ... to defraud." 18 U.S.C. § 1341.

Count 5 is something else, and significantly so since the sentence on this Count was to run consecutively to that imposed on Counts 3 and 4. The federal jurisdictional basis for Count 5 was the mailing of the report of January 6, 1987, from the field insurance adjuster in Fort Worth to the insurer, Western Lloyds.

---

**4.** 18 U.S.C. § 1344 provides the following:
Section 1344 Bank Fraud.
 (a) Whoever knowingly executes, or attempts to execute a scheme or artifice—
 (1) to defraud a federally chartered or insured financial institution; or
 (2) to obtain any of the monies, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

At best, this letter is on the border line and just barely sufficient to establish that its mailing was "for the purpose of executing [the] scheme." Much like the letters in *United States v. Castile*, 795 F.2d 1273 (6th Cir.1986), and our opinion in *United States v. LaFerriere*, 546 F.2d 182 (5th Cir.1977), which the Sixth Circuit favorably embraced, this letter affirmatively stated:

> ORIGIN: This loss is a result of an *Arson Explosion* with the actual explosion occurring in the restaurant next to the insureds.

(Emphasis added.)

The letter went on to state that the "ORIGIN has been investigated by the Fort Worth Fire Department, the ATF [Alcohol, Tobacco, Firearms] Division of the Treasury Department, other local and state agencies and several engineers, and cause and origin experts."

More than that the letter stated: "We have discussed the loss with the Fort Worth Fire Department and with the investigators from ATF and determined that they had started interviewing the insured and his partner when they [insured and partner] became upset and employed the services of an attorney who now represents them." In the remaining portion, the report concluded:

> SUBROGATION: This loss is a result of arson and subrogation is questionable at this time....

All that could have possibly saved the sufficiency of this letter report as a jurisdictional mailing was (i) the fact that the assured, McClelland, was not expressly identified as the arsonist, and (ii) as reflected by the report "we hope that the arsonist will be determined which will clear up any subrogation question or possibilities." But whatever deficiencies the report might have had from this standpoint, we are left with the big Query: How, in heaven's name, could this letter, practically branding (but not establishing) that McClelland was the arsonist—guilty of a felony in Texas and having no right of recovery under the insurance policy—possibly be sent with the "purpose of executing [the] scheme" to defraud the insurance company?

Were it not for the fact that through my dissenting opinion on the bank fraud count the consequences of this questionable border line might be ameliorated by F.R.Crim. P. Rule 35 on remand, I would dissent, not concur.

### Bank Fraud

Although I wonder why the government thought it had to drag this obviously run-of-the-mill Fort Worth crime case into the Federal Court, I agree with the court that the conviction for bank fraud was fully supported if—and the if is a very big one—the defrauded bank was a "federally ... insured financial institution." 18 U.S.C. § 1344(a)(1).

On this critically decisive, constitutionally indispensable issue calling for proof beyond a reasonable doubt, the only evidence was that referred to in the court's opinion from a vice-president and loan officer of the bank who testified, without objection, that at all times during the period the bank was insured by FDIC. Although his descriptive title as "vice-president" may have given him a status above, say, a custodial janitor, there is not a stitch of evidence as to either his authority or his knowledge, including that of any knowledge or reason to know of the maintainance by the bank of a status as an insured institution under FDIC.

This is another instance, of which there are too many, in which this court—although with apologies which seem to salve the collective conscience—accepts little or no real evidence of this critical insured status. Not that we don't apologize for it, or more important, demand some improvement. Rather, it is our recognition that what we say is not heeded by prosecutors who are continuously replaced and who, not looking in the books know nothing of this message we have so long sounded at the expense of published volumes of the Federal Reporter.

Since seldom—as would be true in this case—the problem is really not en banc-worthy, my only recourse is, as a single

voice, to speak out as one claiming the exercise of the supervisory power of the court, to lament the indifference of prosecutors to what we say and, because of this, the necessity for the court finally to take action in a way which will assuredly attract their attention.

In over 30 years this court, and our sister Courts of Appeals, have been struggling with questions of adequate proof of this simple, and nearly always indisputable fact.[1] By specific suggestions understandable to the greenest neophyte in the first hour of a career as an Assistant United States Attorney, we have outlined the easy, sure ways to prove this critical fact. *See Maner,* 611 F.2d at 112, n. 2.

In *Maner,* stating "we have difficulty comprehending why the Government repeatedly fails to prove this element more carefully since the Government's burden is so simple and straightforward[,]" we fix the blame. *Id.* at 112. "[T]he fault lies not with the Trial Judge. It rests squarely on the shoulders of the prosecutor." *Id.*

Now nine years since *Maner* things are no better. The prosecutor, possibly spared by the lapses of defense counsel continued in their sloppy ways to establish this indispensable fact by the words from one who may never have had the slightest information about obtaining or maintaining FDIC insurance. *Maner* predicted "the possibility that we or our sister Courts may someday be faced with an insufficiency of the evidence of insurance under § 2113 which would warrant reversal."[2] That is exactly what this court felt compelled to do in *United States v. Platenburg,* 657 F.2d 797 (5th Cir.1981). If our words are ever to be heeded, a like reversal should be had here. To bring home, to United States Attorneys the message that insurance coverage just as any other constitutionally required fact must really be proved, I think the conviction for bank fraud should be reversed. *See United States v. Chiantese,* 546 F.2d 135 (5th Cir.), *modified en banc,* 560 F.2d 1244 (1977), *on remand,* 582 F.2d 974, 978,

*cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979).

I therefore dissent as to it.

---

**1.** *See* the cases cataloged in n. 1 of *United States v. Maner,* 611 F.2d 107, 111 (5th Cir.1980).

