**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William Leon CHURCH, Defendant–Appellant.**

**No. 89–1297 Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Oct. 26, 1989.

Mary Stillinger, Caballero, Panetta & Ortega, El Paso, Tex. (Court-appointed), for defendant-appellant.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., Antonio, Tex., for plaintiff-appellee.

Before GEE, DAVIS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The classic movie "Miracle on Thirty–Fourth Street" examines the need to believe in Santa Claus, who selflessly dispenses favors irrespective of the merit of the recipient. Just as some people need to believe in Santa Claus, other souls need to believe that they are Santa Claus. Mr. Church is apparently in the latter group. His harmless and ineffectual pretense resulted in a conviction for three counts of attempted bank and mail fraud. We reluctantly hold that there is sufficient evidence to support the conviction.

Church apparently maintained a long-standing delusion of his own wealth and capacity to be a generous benefactor. FBI agent Burchfield, who interviewed Church after giving him *Miranda* warnings, testified that Church had apparently attempted to give bequests in the hundreds of thousands of dollars to 21 individuals. In one instance Church prepared a half-million dollar draft, purportedly drawn on a Texas bank, and inscribed it to the payee, "Loves You Unc[le] Bill". Church initially told agent Burchfield that he had a large account at Seattle–First National Bank ("Bank"), the bank which he allegedly sought to defraud. Burchfield also testified that no money ever changed hands according to these various drafts or proposed transactions, nor, to his knowledge, had Church ever received any money from a financial institution. Church's pattern of activity unfolds in detail in the case before us.

In 1982, Church was incarcerated at La Tuna Federal Correctional Institution near El Paso, Texas. He began making collect phone calls to Eugene A. Brown, a vice president of Seattle–First National Bank in charge of its Special Trusts Area. Church told Brown that he was planning to transfer between $30 and $40 million to the Bank from brokerage accounts and a Swiss bank account. He needed to set up an interim account in which money could be placed until he could establish a trust account. Brown testified that he had no reason to disbelieve Church's representations, and he accordingly assigned a provisional bank account number to the agency account and sent documentation for that account to Church. The agency account agreement did not, however, become binding or the account active because the agreement was never executed by a bank

executive. The Bank never received any funds on Church's behalf. Church never actually became a customer of the Bank.

On June 27, 1985, a Western Union mailgram issued which was addressed to Brown at the Bank and purported to confirm a message that Brown had sent to Church. The mailgram indicated that, pursuant to Church's instructions, the Bank had transferred $69,271,545.00 from Seattle–First to Church's account at a bank in the Bahamas, to be added to $130 million already in the foreign account. Brown considered the mailgram a hoax: he did not prepare it, and the Bank never made any such transfer of funds. The mailgram was forwarded to the Bank's security division.

Enter Patrick Dwyer, an El Paso lawyer who met Church in May, 1986. Church had sought Dwyer's legal assistance in some dealings with La Tuna prison officials. Church showed Dwyer a purported trust instrument for a trust that Dwyer believed was created between 1983 and 1985. The instrument purported to relate to the "William L. Church Revocable Trust" at the Boatmen's National Bank of Springfield, Missouri. Attached to the instrument was a financial statement which purported to reflect the value of the trust's investments at over $11 million. Church told Dwyer that this instrument related to one of the trusts that Church had helped to create.

Based on numerous conversations with Church and various documents that Church showed him, Dwyer was led to believe that Church had assets of more than $150 million. Church told Dwyer he wanted to make large gifts of stock shares to some 27 individuals, and he asked Dwyer if he had any "projects that [he] would like to see happen." Dwyer suggested that his old parochial school in El Paso was seriously run down and in need of being replaced by a modern facility.

Church told Dwyer "if a million dollars would kick it off, for me to start acquiring land. And then later on he could help when we had some kind of a plan with cost figures." In return, Church wanted Dwyer to help him draw some of his money that he needed for his own projects. Church asked Dwyer how this could be done, and he also asked Dwyer to get him some bank drafts.

Dwyer obtained some blank bank drafts from his bank in El Paso and gave them to Church, who completed them in his own hand. One draft, made payable to "Pat Dwyer for William Church" and dated May 26, 1986, directed the Bank to transfer by wire $999,000 drawn on Trust Account 707141556 to Dwyer's El Paso bank account. A second draft, made payable to "Pat E. Dwyer Atty at Law" and dated May 24, 1986, directed Bank to wire-transfer $1,000,000 drawn from account 707141556 to Dwyer's bank account.

Church gave Dwyer these two drafts, with Church's handwritten instructions on how to mail them. Dwyer was to put each draft in a plain envelope addressed to Bank with the return address of "William L. Church, 1354 East Nielson Avenue, Mesa, Arizona, 85204." In accordance with these instructions, Dwyer mailed one draft on May 24 and the other on May 27, 1986. At the end of the instructions is written: *"No Phone Calls!* WILL GET NO ANSWERS!" Dwyer complied with this.

Church drafted and signed a very broad power of attorney, naming Dwyer his attorney-in-fact, and had it notarized. Dwyer was to use the power of attorney to collect the money from the drafts and deposit some of it for Church. Dwyer had the power of attorney recorded in the County Clerk's office. Brown testified that the Bank received a copy of it "in connection with one of these bank drafts."

Dwyer was to receive the $1,000,000 proceeds of the May 24 draft so that he could start buying property for the new school building. Church instructed Dwyer to place the $999,000 proceeds from the May 26 draft in a money-market account, an interest-bearing account, or a custodial management account for Church. Dwyer testified that he believed that Church had sufficient funds in Bank to cover the drafts.[1]

---

**1.** Dwyer testified that when he failed to receive payment on the drafts, he assumed that Church

Brown's assistant received both drafts at the Bank. After she showed them to Brown, they were delivered to FBI agents. The Bank did not pay in accordance with the drafts because it did not have any of Church's money. Brown testified that the drafts furnished by Church "had no value because we had no money [in an account]." He agreed that the Bank had no duty to act on those pieces of paper and that there was no possible way that the Bank could have cashed those drafts.

Church did not testify at trial. In his interview with agent Burchfield, Church admitted having signed the bank drafts, although he said that Dwyer prepared them. A handwriting expert testified that most of the writing on the two drafts, and much of that on the handwritten mailing instructions, is that of Church.

■ Church contends that the evidence is insufficient to support his convictions because the Government failed to prove the existence of a scheme and artifice to defraud the Bank.[2] We must review the evidence in the light most favorable to the Government, so that all reasonable inferences and credibility choices support the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The conviction must be affirmed if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ In order to establish Church's guilt on the charges alleged in Counts One and Two, the Government had to prove that he knowingly executed or attempted to execute a scheme and artifice to defraud a federally insured financial institution. 18 U.S.C. § 1344(a)(1). *United States v.*

*McClelland,* 868 F.2d 704, 709 (5th Cir. 1989); *see United States v. Bonallo,* 858 F.2d 1427, 1430–31 (9th Cir.1988). A "scheme or artifice to defraud" includes fraudulent pretenses or representations intended to deceive others, in order to obtain money from the victim institution. *McClelland,* 868 F.2d at 709. In order to sustain Church's conviction on Count Three, the mail fraud count, the Government had to prove both a scheme to defraud and the use of the mails for the purpose of executing the scheme. *Id.* at 706.

■ In asserting that the evidence is insufficient to prove the existence of a scheme or artifice to defraud, Church argues that he did not intend to defraud the Bank and that if he engaged in a scheme or artifice, his goal was not to obtain money. He contends that merely sending the drafts to the Bank does not prove a scheme or artifice, citing *United States v. Bonnett,* 877 F.2d 1450 (10th Cir.1989), and *United States v. Gunter,* 876 F.2d 1113 (5th Cir. 1989). *See also Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982) (holding that the deposit of a check backed by insufficient funds does not constitute the making of a false statement under federal criminal law). We are constrained to disagree.

The Government asserts that the scheme began in 1982 with Church's overtures to Brown, whereby he persuaded the Bank to set aside an account number for his later use. The Government characterizes Dwyer as "an unwitting dupe in his plan." Part of the scheme thus allegedly consisted in Church's persuading Dwyer to obtain bank drafts and to ensure that they were mailed according to his instructions. Because of these actions in addition to Church's furnishing insufficient funds drafts to the

was having trouble with the Bank; Church had told Dwyer that the Bank was withholding funds from him. According to Dwyer, Church always had an explanation why his various transactions were not producing any money.

2. Church also contends that the court should have instructed the jury that "a bank draft is not a statement and in and of itself cannot be a false or fraudulent statement or representation." *See Williams v. United States,* 458 U.S. 279, 102

S.Ct. 3088, 73 L.Ed.2d 767 (1982). We reject this contention because the charge as a whole properly instructed the jury on the elements of a violation of 18 U.S.C. § 1344(a)(1). In particular, the court informed the jury that a "scheme" or "artifice" means any plan or course of action intended to deceive others ..." This definition prevented the jury from convicting solely on the basis of the insufficient funds bank drafts.

Bank, we find *Williams, supra,* distinguishable.

Notwithstanding that a pattern can be ascribed to these events, the sheer ineffectuality of Church's actions gives us pause in finding a scheme or artifice to defraud. The Bank never actually opened an account in his name in 1982 or later. When Church mailed his drafts to the Bank in 1986, there was no way that the Bank would simply hand over its money, inasmuch as Church had neither an account nor funds on deposit from which he claimed to draw. The bank witness verified that the Bank never intended to pay on his drafts. Church's scheme bespeaks a mind locked in fantasy rather than reality. His plan was no more likely to succeed than a request that the Bank exchange monopoly money for its face value in U.S. currency.

We are reluctant, however, to cabin the reach of the bank fraud statute by our view of the implausibility of a particular scheme to defraud. The essence of fraud is that its perpetrator has persuaded his victim to believe, beyond the dictates of reason or prudence, what is not so. That a particular scheme is impracticable, or ultimately unsuccessful, is not necessarily inconsistent with its being fraudulent. As jurors, we might have been inclined to decide either that Church carried out no illegal scheme or that he did not possess the requisite intent to defraud the Bank. There was, however, evidence from which a jury could draw the contrary conclusions. The evidence of a scheme is recounted above. As for Church's intent, his comments to Agent Burchfield might be interpreted as a desire to evade responsibility by a claim that Dwyer caused the bank drafts to be prepared. The jury was duty-bound to assess Church's credibility from these comments and his overall conduct. Church's attorney argued in closing that Church carried out a scheme to get attention, not to defraud; that Dwyer advised the fraudulent plan; and that the scheme could not possibly have persuaded the Bank to part with its money. The jury disagreed. We are not prepared to say that, as a matter of law, there was insufficient evidence to convict him.

The conviction is AFFIRMED.