**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Daniel A. MEDELES,**
**Defendant–Appellant.**

**No. 90–8046.**

United States Court of Appeals,
Fifth Circuit.

Oct. 17, 1990.

Michael S. McDonald, Asst. Federal Public Defender, and Lucien B. Campbell, Federal Public Defender, El Paso, Tex., for defendant-appellant.

LeRoy M. Jahn, Krista L.S. Leinenkugel, Asst. U.S. Attys. and Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before RUBIN, GARWOOD, and HIGGINBOTHAM, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Daniel A. Medeles (Medeles) appeals his conviction for executing or attempting to execute a scheme to obtain money from a federally insured financial institution by means of false or fraudulent pretenses or representations, contrary to former 18 U.S.C. § 1344(a)(2). For the section 1344(a)(2) element of pretense or representation, the government charged and proved only that Medeles knowingly wrote insufficient funds checks on his checking account at a federally insured institution and deposited those checks in his checking accounts at other financial institutions to cover other checks he had written on the latter accounts and which, but for such deposits, would have overdrawn those accounts. Medeles contends that this does not suffice to establish that he made any misrepresentation or pretense, as the unembellished depositing of a check is not of itself a representation that the bank account on which it is drawn has a sufficient balance to cover it. We agree, and accordingly reverse.

### Facts and Proceedings Below

Medeles engaged in a check kiting scheme from September 1 to September 8, 1988. The scheme involved three federally insured banks in the El Paso, Texas metropolitan area—MBank, Government Employees Credit Union (GECU), and Merabank—at each of which Medeles maintained a checking account. Medeles initiated his scheme by depositing four checks totaling $1,520 in his MBank checking account. These checks were drawn on his GECU checking account, which had a balance of $263.38. To cover the overdraft, Medeles deposited checks in the amount of $1,425 in the GECU account. These checks were drawn on his MBank account, which also had insufficient funds. Medeles then deposited three checks totaling $1,632—drawn on his GECU account—in his MBank account. This rotation, which ultimately also involved Medeles' account at Merabank, continued until September 8, when Medeles withdrew $3,700 from MBank and flew to Las Vegas for a gambling spree.

Medeles was indicted and convicted on three counts of bank fraud under former 18 U.S.C. § 1344(a), which provided:

"(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"(1) to defraud a federally chartered or insured financial institution; or

"(2) to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or

insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both." [1]

Count one of the indictment alleged that, during the first fifteen days of September 1988, Medeles:

"[D]id knowingly and unlawfully devise a scheme for the purpose of obtaining moneys and property by means of false and fraudulent pretense and representations, to wit: Defendant wrote checks drawn on his checking account at MBank, whose deposits are insured by the Federal Deposit Insurance Corporation, which did not have a sufficient balance in that account to cover those checks and deposited these same checks into other El Paso area financial institutions in order to cover checks which had been written on those accounts, in violation of Title 18, United States Code, Section 1344."

Counts two and three are worded identically to count one, except only that the count one words, "MBank, whose deposits are insured by the Federal Deposit Insur-

ance Corporation," are replaced, in count two by "the Government Employees Credit Union, whose deposits are insured by the National Credit Union Administration Board," and in count three by "the Merabank, whose deposits are insured by the Federal Savings and Loan Insurance Corporation."

Although the indictment does not specify whether the offense charged is a violation of clause (1) or clause (2) of former section 1344(a), we agree with Medeles, and the government concedes, that conviction may be sustained, if at all, only under clause (2), as the indictment does not allege, and the charge did not require the jury to find, any intent or purpose to "defraud" a federally chartered or insured financial institution, and indeed the charge was solely in the language of clause (2). [2]

Aside from Medeles' writing and depositing, in his checking accounts, insufficient funds checks drawn on other accounts of his, there is no evidence or allegation that Medeles made any representation or pretense. Medeles, who moved for judgment of acquittal at the close of the government's case and again at the close of all the

---

**1.** Former section 1344(b) merely defined "federally chartered or insured financial institution" as used in section 1344(a). In 1989, section 1344 was amended by, *inter alia,* deleting former part (b) thereof and reconstituting former part (a) simply as section 1344. Pub.L. 101–73, Title IX, § 961(k), 103 Stat. 500. As so amended, section 1344 now reads in full as follows:

"Whoever knowingly executes, or attempts to execute, a scheme or artifice—

"(1) to defraud a financial institution; or

"(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

"shall be fined not more than $1,000,000 or imprisoned not more than 20 years, or both."

As a result of Pub.L. 101–73, Title IX, § 962(e), 103 Stat. 523, the term "financial institution," as used in Title 18, is now defined in 18 U.S.C. § 20.

**2.** Thus, the jury was charged:

"Title 18, United States Code, Section 1344, makes it a federal crime for anyone knowingly to execute or attempt to execute a scheme or artifice to obtain any of the moneys or

other property owned by or under the custody or control of a federally-insured financial institution by means of false or fraudulent pretenses or representations.

"For you to find the Defendant guilty of the crime alleged in count one of the indictment, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

"First that the defendant knowingly executed or attempted to execute a scheme or artifice to obtain money or property from the custody or control of MBank by means of false or fraudulent pretenses or representations, and

"Second that MBank was from on or about September 1, 1988, until on or about September 15, 1988, a federally-insured financial institution."

The last three paragraphs above-quoted were repeated in the charge, verbatim, as to counts two and three, with substitution of the count number and, for "MBank," of "Government Employees Credit Union" and "Merabank," respectively.

The jury charge also defined "[t]he words scheme and artifice" as "any plan or cause of action intended to deceive others and to obtain, by false or fraudulent representations, money or property."

evidence, contends on appeal that the evidence is accordingly insufficient to sustain his conviction on any of the counts because it does not establish the "false or fraudulent pretenses, [or] representations" element of former section 1344(a)(2).[3]

## Discussion

As the language and structure of former section 1344(a) reflect, it establishes two different offenses, though each shares common elements (and may otherwise somewhat overlap). Each offense is one against "a federally chartered or insured financial institution" and each has the primary element of "knowingly executes, or attempts to execute, a scheme or artifice." The difference between the two offenses lies in what the scheme or artifice against the institution must consist of. For the first offense, defined in clause (1), the denounced scheme or artifice has but a single required element, namely, that it be one "to defraud" the institution. For the second offense, defined in clause (2), the proscribed scheme or artifice is not characterized as one "to defraud" but rather is described as having two somewhat different required elements, namely: *first,* that it be "to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of" the institution; and *second,* that it be to do so "by means of false or fraudulent pretenses, representations, or promises." *See United States v. Bonnett,* 877 F.2d 1450, 1453–54 (10th Cir.1989).[4]

Here, as previously noted, we deal only with the clause (2) offense. What Medeles challenges is the sufficiency of the evidence to establish the second element— false or fraudulent pretenses or representations—of that offense.[5] The government concedes that the only evidence of any false or fraudulent pretense or representation is Medeles' deposit in his account at one bank of checks drawn on his account in another bank knowing that the account on which the checks were drawn had insufficient funds to cover those checks. In essence, the government's position is that the mere deposit of a check into one's bank account, drawn on the depositor's account in another bank, is a representation that there are sufficient funds in the account on which the check is drawn to pay it; or, at least, that repeated such deposits by a giv-

3. This is the sole contention raised by Medeles on appeal. As he does not challenge the sufficiency of the indictment, we do not rule on that. We do note, nevertheless, that the indictment does not contain the statutory language of *"executes, or attempts to execute,* a scheme" (emphasis added), but instead alleges that Medeles did *"devise* a scheme" (emphasis added). The jury charge, however, was in terms of execute or attempt to execute (*see* note 2, *supra* ). Further, although the indictment states that Medeles devised his scheme "for the purpose of obtaining moneys and property," it fails to expressly allege who owned or had custody or control of such moneys or property or from whom Medeles obtained or sought to obtain the moneys or property. And, each count named only one federally insured institution, but the named institution in each count was the bank with the account on which Medeles' insufficient funds checks were allegedly drawn, and not the bank with the account in which those checks were allegedly deposited. It may be questioned whether the financial institution whose (or from whom) money or property was (or was to be) obtained by the scheme would be the bank with the account on which the checks were drawn— the only bank named as a federally insured institution in each count—rather than the bank with the account in which the checks were de-

posited, the banks described in each count as the "other area El Paso financial institutions" but not identified as federally insured institutions. None of the counts cross-references any of the others.

4. In *Bonnett,* the court observed:

"The plain language of 18 U.S.C. § 1344 sets forth two distinct crimes concerning federally insured financial institutions. Each crime requires a defendant first to knowingly execute a scheme or artifice. To convict a defendant of a crime under subsection (1) the government would have to prove the scheme *defrauded* the financial institution. To convict a defendant under subsection (2), the government would have to prove the scheme enabled the defendant to obtain certain property *'by means of false or fraudulent pretenses, representations or promises.'"* *Id.* (emphasis in original).

5. Neither the indictment nor the charge mentions "promises," so we do not concern ourselves with those.

As to the first element under clause (2), the indictment and charge concern only obtaining "moneys or property," and no mention is made of "funds, credits, assets" or "securities."

en individual amount to such a representation. Medeles argues to the contrary, relying principally on *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). *Williams* also involved a check kiting scheme. The defendant there was charged under 18 U.S.C. § 1014, which applies to "[w]ho[m]ever knowingly makes any false statement or report, or willfully overvalues any land, property or security...." The Supreme Court held that the depositing of checks the defendant knew were not supported by sufficient funds was not conduct that involved the making of a false statement (or a willful overvaluation) under the statute. *Williams*, 102 S.Ct. at 3091.

In *Williams*, the only false statement alleged by the government was the defendant's presentation of a check to a bank and the assertedly therein implicit representation that the check was covered by sufficient funds. The Court stated that "each individual count of the indictment in this case stated only that petitioner knowingly had deposited a single check that was supported by insufficient funds, not that he had engaged in an extended scheme to obtain credit fraudulently." *Id.* at 3093 (footnote omitted). The government argues that *Williams* stands for the proposition that whereas the depositing of a *single* check is not a representation, the depositing of *multiple* checks can be.

The government overlooks, however, language in *Williams* indicating that depositing multiple insufficient funds checks likewise is not a representation. *Williams* states that "[a]lthough petitioner deposited several checks that were not supported by sufficient funds, that *course of conduct* did not involve the making of a 'false statement,' for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id.* at 3091 (emphasis added); *see United States v. Cron-*

*ic,* 900 F.2d 1511, 1515 (10th Cir.1990) (holding under mail fraud statute that if a single insufficient funds check does not constitute a misrepresentation, then a series of checks cannot either; "[t]hat is, any multiple of zero is zero.")

Moreover, the *Williams* language relied on by the government appears in the same paragraph as the Court's criticism of a construction which would allow conviction for knowing deposit of an insufficient funds check "whether or not the drawer had an intent to defraud." *Id.* 102 S.Ct. at 3092.[6] In light of the fact that clause (1) of former section 1344(a) expressly requires that the scheme be one "to defraud," while clause (2) does not but rather extends to any knowingly false representation, we consider that the portion of the *Williams* opinion relied on by the government is not persuasive as a basis on which to construe clause (2). We recognize that the introductory "scheme or artifice" language of section 1344(a) may carry overtones of something akin to fraud, but the significance of this is substantially weakened as to clause (2) by the fact that clause (1) expressly proscribes a scheme or artifice "to defraud" and clause (2)—presumably covering a different subject matter—does not.[7]

We also recognize that *Williams* dealt with whether an insufficient funds check constituted a "false statement or report"— or reflected that the depositor "overvalue[d] any land, property or security"— within the purview of 18 U.S.C. § 1014. Former section 1344(a)(2) speaks of "false or fraudulent pretenses, [or] representations." Though the language is different, we conclude that the *Williams* rationale nevertheless applies. The underlying basis of *Williams* is that "a check is not a factual assertion at all and ... cannot be characterized as 'true' or 'false'" and that a check does not "make any representation as to the state of ... [the drawer's] bank

---

6. *See also id.* 102 S.Ct. at 3093 n. 8 (position of dissent, that section 1014 differentiates between knowing deposits of insufficient funds checks depending on whether depositor hoped to cover the checks, criticized on the basis that section 1014 does not require an intent "to defraud").

7. Further, as observed in the text below, the *Williams* rationale has been applied to the portions of 18 U.S.C. §§ 1341 and 1343 denouncing "any scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...."

balance." *Id.* at 3091. If the deposit of a check is not an assertion about the balance in the account, then it seems to us that known insufficiency in the account when the check is deposited cannot of *itself* constitute the deposit a false or fraudulent pretense or representation.[8] That has been the conclusion of other courts which have applied the *Williams* rationale in construing the portion of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, dealing with "any scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," although these courts have also recognized that check kiting may be properly prosecuted under the "any scheme or artifice to defraud" language of those statutes. *United States v. Frankel*, 721 F.2d 917 (3d Cir.1983); *United States v. Rafsky*, 803 F.2d 105 (3d Cir.1986); *Cronic*, 900 F.2d at 1514 ("[g]enerally speaking, and assuming the existence of other elements such as intent, check kiting constitutes a scheme to defraud under the mail fraud statute, as well as the wire and bank fraud statutes, 18 U.S.C. §§ 1343, 1344, which contain almost identical language"), 1516 ("a bare check kiting scheme, unembellished by other acts or communications, does not violate the false or fraudulent pretenses, representations, or promises clause of the mail fraud statute"). *Cf. United States v. Kucik*, 844 F.2d 493, 500 (7th Cir.1988) (holding, in prosecution under 18 U.S.C. § 2113(b), that the *Williams* rationale extends to a "false pretense" as well as a "false statement," and leaving to the Supreme Court any possible narrower reading of *Williams*).[9]

The government cites *Bonnett* in support of the proposition that "the use of a series of insufficient funds checks to artificially inflate an account balance can constitute a violation of 18 U.S.C. § 1344(a)(2)...." *Id.* 877 F.2d at 1456. *Bonnett* is properly distinguished from the instant case, however, for the defendant in *Bonnett* engaged in an extensive scheme involving false representations and pretenses in addition to the mere depositing of checks known to be insufficient funds.

*Bonnett* involved a scheme whereby bank officers in league with Bonnett accepted for deposit in his account checks to him from his co-conspirator Dierksen drawn on Dierksen's accounts at various out-of-state banks. All parties knew that the checks were supported by insufficient funds. The defendants created the Dierksen accounts in out-of-state banks to increase turn-around times, sent the checks back repeatedly for collection after they had been returned insufficient funds, and nevertheless maintained credit for the deposits based on the insufficient funds checks. *Id.* at 1456. *Bonnett* held that this course of conduct:

"[W]as designed to give the impression, both to the regulatory authorities and to Bank's own board of directors, that the Dierksen checks were in fact drawn on collectable funds, when in fact defendants knew to the contrary. The misrepresentation in this case was not an implied representation that the checks were good, as in *Williams;* rather it was the conduct of the conspirators in acting as if the checks were good and treating the checks in all respects as if they were drawn on collectable funds, with the knowledge the Dierksen checks were worthless." *Id.* at 1457.

---

**8.** A check does contain the drawer's agreement to pay, upon dishonor and any necessary notice or protest, the amount thereof to the holder. *Id.* at 3092. While we do not decide the question, conceivably the deposit of a check with the intent not to fulfill this agreement, but to nevertheless withdraw the funds thus credited to the account in which the deposit was made, might constitute a fraudulent promise for purposes of former section 1344(a)(2), although such conduct would appear to more properly be charged under former section 1344(a)(1) as an attempt to defraud the depository bank. In any event, no such intent—nor any promise or ultimate loss (actual or contemplated) to the bank—is alleged in the indictment or required by the charge here.

**9.** *Kucik* does state that "the passage of section 1344 has made the question largely academic." *Id.* However, for the reasons stated subsequently in the text, we do not consider this passing remark to indicate that *Williams* does not apply to former section 1344(a)(2), but rather that any "gap" created by *Williams* was filled by former section 1344(a) as a whole.

The key to *Bonnett* appears to be the misrepresentations to the bank board and the regulatory authorities by the co-conspirator bank officers in keeping the posted balance of Bonnett's account at a known falsely high level. In *Cronic*, the Tenth Circuit declined to extend *Bonnett*, noting that in *Bonnett* "separate representations induced the banks to permit overdrafts in the subject accounts." *Cronic*, 900 F.2d at 1517. We conclude that *Bonnett* is inapplicable to the present case.

The government finally argues that Congress intended former section 1344 to close a jurisdictional gap created by *Williams*. Former section 1344 was originally enacted October 12, 1984. Pub.L. 98–473, Title II, § 1108(a), 98 Stat. 2147. The Senate Report on a predecessor bill (S. 1762) in the previous session, which contained the provisions that were subsequently enacted as section 1344 in October 1984, states that

"the scope of present Federal statutes is not sufficient to assure effective prosecution of the range of fraudulent crimes commonly committed today against federally controlled or insured financial institutions. [Section 1344] would meet the need for a statutory basis for asserting Federal jurisdiction over such offenses and would thereby better assure the integrity of the Federal banking system." S.Rep. No. 225, 98th Cong., 1st Sess. 379 (1983), *reprinted in* 1984 U.S. Code Cong. & Ad.News, 3182, 3519.

The Senate Report refers specifically to *Williams* as one of a number of "[r]ecent Supreme Court decisions [that] have underscored the fact that serious gaps now exist in Federal jurisdiction over frauds against banks...." *Id.* at 378, 1984 U.S.Code Cong. & Ad.News, 3518. The Report also notes "various gaps in existing statutes, as well as the lack of a unitary provision aimed directly at the problem of bank fraud." *Id.* It states that the proposed new section 1344 "is modeled on the present wire and mail fraud statutes." *Id.*

Congress may well have intended that former section 1344 as a whole fill some perceived gap created by *Williams*. However, our holding applies only to former section 1344(a)(2). It would appear, though

we do not so decide as the matter is not before us, that Medeles' unembellished check kiting, accompanied by an intent to defraud, could sustain a conviction under former section 1344(a)(1).

Furthermore, the language of the statute suggests that Congress did not intend section 1344(a)(2) to alone accomplish any gap-filling task. Section 1344(a)(2) requires that the government prove the making of "false or fraudulent pretenses, representations, or promises." When Congress wrote former section 1344(a)(2), *Williams* had already defined "statement" not to incorporate the unembellished depositing of an insufficient funds check. Moreover, *Williams* had said that "a check is not a factual assertion at all," is not capable of being " 'true' or 'false,' " and does not "make any *representation* as to the state of ... [the] bank balance" on which it is drawn. *Id.* 102 S.Ct. at 3091 (emphasis added). Where Congress has used words of settled meaning, we will generally infer, absent unambiguous statutory language to the contrary, that Congress intended that the words assume their established meaning. *See National Labor Relations Board v. Amax Coal Co.*, 453 U.S. 322, 101 S.Ct. 2789, 2794, 69 L.Ed.2d 672 (1981). Further, ten months before Pub.L. 98–473 had passed either the House or the Senate (though not before the above-cited Senate Report 98–225), the Third Circuit in *Frankel* had held that mere unembellished check kiting did not come within the "scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" provisions of the mail and wire fraud statutes.

We conclude that the legislative history does not suffice to displace *Williams* in construing clause (2) of former section 1344(a) or to constitute the depositing of a check as a representation or pretext respecting the balance then in the account on which it is drawn for purposes of that portion of the statute. We also note, as did the Court in *Williams*, that

" ' "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, be-

**202**

fore we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." ' "  *Id.* at 3094.

### Conclusion

The only evidence that Medeles made any false or fraudulent pretenses or representations is his mere depositing of a series of checks he knew to be insufficient funds. We hold that because the depositing of a series of known insufficient funds checks does not alone constitute "false or fraudulent pretenses, [or] representations," Medeles' conviction under former section 1344(a)(2) must be, and is hereby,

REVERSED.