# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 25, 2007**

Charles R. Fulbruge III
Clerk

No. 05-51395

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

ELLIS MORGANFIELD;
LEROY THOMAS

Defendants-Appellants

Appeals from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, DAVIS, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Ellis Morganfield and Leroy Thomas were each convicted on one count of conspiracy to violate 18 U.S.C. § 514(a), and one count of aiding and abetting the violation of 18 U.S.C. § 514(a) and 18 U.S.C. § 2. Morganfield was also convicted on two counts of aiding and abetting bank fraud in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2. They appeal their convictions. We affirm in part, reverse in part, vacate Morganfield's sentence, and remand for resentencing.

I.

Ellis Morganfield and Leroy Thomas were key participants in a simple but effective check cashing scheme. The scheme essentially operated in four steps. First, registering an entity with a local authority, they obtained a d/b/a certificate for the business. There was no business, however, just a nonexistent shell company. Second, the conspirators used the d/b/a certificates to open commercial checking accounts in the names of the shell companies, making a small initial deposit. The banks would assign account numbers and issue checks in the names of the shell companies. The conspirators used the personal identifications of other persons, which were bought or stolen, when opening the checking accounts. Third, the conspirators would make the shell company checks, styled as payroll checks, payable to fake payees using the names of persons whose identifications they also had either bought or stolen. The checks were signed with the name of a nonexistent person, often with a signature stamp. The amounts the checks were drafted for would exceed the value of the deposit used to open the checking account. Finally, the conspirators would cash the checks at unsuspecting grocery and convenience stores.

II.

Morganfield and Thomas, along with Gordon Dunn, Alexis Morganfield, Reggie President, Shalita Williams, Ebonie Toye, and Douglas Jones, were indicted by a grand jury sitting in the Western District of Texas. Count one charged Morganfield and Thomas with conspiracy to utter a fictitious instrument in violation of 18 U.S.C. § 514(a)(2); count two charged them with aiding and abetting the uttering of a fictitious instrument in violation of 18 U.S.C. § 514(a)(2) and 18 U.S.C. § 2. Counts five and six charged Morganfield with aiding and abetting bank fraud in violation of 18 U.S.C. § 1344 and 18 U.S.C. § 2.

Morganfield and Thomas were tried by jury in April 2004, and found guilty on all counts. Numerous members of the conspiracy testified against Morganfield and Thomas.

The district judge sentenced Morganfield to 60 months' imprisonment on count one and 145 months' imprisonment on each of counts two, five, and six, to run concurrently, and supervised release. Thomas received a sentence of 60 months' imprisonment on count one and 100 months' imprisonment on count two, to run concurrently, and supervised release. Thomas's sentence was enhanced for using a minor, his then-minor girlfriend, in furtherance of the scheme.

Morganfield and Thomas now appeal. They first contend that there was insufficient evidence to find them guilty on counts one and two because a check, even if it is worthless, is not, as a matter of law, a "false or fictitious instrument." We agree.[1]

Morganfield raises three challenges to his bank fraud convictions: the government failed to prove the use of "false or fraudulent pretenses, representations, or promises" to obtain funds; intent to defraud financial institutions; and that any financial institution faced a risk of loss or civil liability. He also alleges that statements in the prosecutor's rebuttal argument were improper and require reversal of his conviction and a new trial. We disagree with all four contentions.

III.

Morganfield and Thomas argue that, as a matter of law, there was insufficient evidence to sustain their convictions on counts one and two because 18 U.S.C. § 514(a)(2) applies, in the words of Morganfield's brief, to the "passing

---

[1] Morganfield and Thomas also challenge their convictions on counts one and two on other grounds, and Thomas appeals the enhancement of his sentence for the use of a minor in furtherance of a crime. Because we reverse the § 514 convictions on the statutory construction question, we need not address those issues.

of wholly nonexistent types of financial instruments, not the passing of worthless checks."[2]

Section 514(a)(2) provides that

[w]hoever, with intent to defraud, passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States, any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, or an organization, shall be guilty of a class B felony.

Terms in § 514(a) are defined by reference to 18 U.S.C. § 513(c).[3] Section 513(c)(3)(A) defines a "security" as including a check. Neither § 514 nor § 513(c) define what constitutes a "false or fictitious instrument, document, or other item."

As the Ninth Circuit noted, § 514 "is a relatively new statute; under it, prosecution appears to be infrequent."[4] As such, there is not a wealth of case law interpreting it. The legislative history is helpful in interpreting its scope. According to then-Senator Alfonse D'Amato's floor statement introducing the legislation:

This legislation combats the use of factitious [sic] financial instruments to defraud individual investors, banks, pension funds, and charities. These fictitious instruments have been called many names, including prime bank notes, prime bank derivatives, prime bank guarantees, Japanese yen bonds, Indonesian promissory notes, U.S. Treasury warrants, and U.S. dollar notes.

. . .

---

[2] Appellant-Morganfield's Brief at 10.

[3] 18 U.S.C. § 514(b).

[4] United States v. Howick, 263 F.3d 1056, 1066 (9th Cir. 2001), cert. denied, 535 U.S. 946 (2002).

Because these fictitious instruments are not counterfeits of any existing negotiable instrument, Federal prosecutors have determined that the manufacture, possession, or utterance of these instruments does not violate the counterfeit or bank fraud provisions contained in chapters 25 and 65 of title 18 of the United States Code. The perpetrators of these frauds can be prosecuted under existing Federal law only if they used the mails or wires, or violated the bank fraud statute.

Mr. President, we have worked closely with the Treasury Department and various U.S. Attorneys' Offices to prepare the Financial Instruments Anti-Fraud Act of 1995. This bill makes it a violation of Federal law to possess, pass, utter, publish, or sell, with intent to defraud, any items purporting to be negotiable instruments of the U.S. Government, a foreign government, a State entity, or a private entity. It closes a loophole in Federal counterfeiting law.[5]

The Ninth Circuit's decision in United States v. Howick offers the most thorough analysis of the section's scope. In Howick, the defendant was convicted of, among other things, possessing with intent to defraud $100,000,000 and $500,000,000 Federal Reserve notes in violation of § 514(a). The Federal Reserve had never printed notes in those denominations. After quoting the section's legislative history, the court explained that "[a] 'counterfeit' obligation is a bogus document contrived to appear similar to an existing financial instrument; a 'fictitious' obligation is a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument, and where the fact of the genuine instrument's nonexistence is presumably unknown by, and not revealed to, the intended recipient of the document."[6] In other words, according to the court, "'false or fictitious instrument' in section 514 [refers] to nonexistent instruments, whereas the phrase 'falsely made, forged, counterfeited, or altered obligation' in section 472 refers to doctored up versions

---

[5] 141 Cong. Rec. S 9533-34.

[6] Howick, 263 F.3d at 1067.

of obligations that truly exist."[7]  Other courts have similarly interpreted § 514(a).[8]

The government argues that the dichotomy between existent and nonexistent securities is too formalistic.  Instead, the government urges that "the proper inquiry is whether through 'scheme or artifice' the defendants have sought to create a false or fictitious obligation, not whether they used an ostensibly genuine piece of paper."[9]

In support of its argument, the government first points to the section's title, "Fictitious obligations."  This argument is not helpful on two accounts.  First, the section heading is itself question begging.  The American Heritage Dictionary defines "obligation" as including both "[a] legal agreement stipulating a specified payment or action" and "the document containing the terms of such an agreement."  While the former supports the government's position, the latter supports the construction of the statute urged by Morganfield and Thomas.  "For interpretative purposes, [titles] are of use only when they shed light on some ambiguous word or phrase."[10]  Second, and more important, "headings and titles are not meant to take the place of the detailed provisions of the text."[11]  The text of § 514(a), while not an exemplar of precise drafting, supports the Ninth

---

[7] Id.

[8] See, e.g., United States v. Anderson, 353 F.3d 490, 500 (6th Cir. 2003), cert. denied, 541 U.S. 1068 (2004) (quoting approvingly from Howick the distinction between "counterfeit" and "fictitious obligations"); United States v. Getzschman, 81 Fed. Appx. 619, 622 (8th Cir. 2003) (unpublished per curiam opinion) ("This court previously has noted that the legislative history of § 514(a) indicates the statute covers wholly nonexistent types of financial instruments."); United States v. Summa, No. 02-CR-101(GEL), 2003 WL 21488093 (S.D.N.Y. June 25, 2003) ("The conduct prohibited [under § 514(a)] is the uttering of instruments that purport to be genuine obligations of (in this instance) the United States, but which are not. . . . [T]he statute is quite clear that it covers 'false and fictitious' instruments that masquerade as 'actual securit[ies]' . . . .").

[9] Appellee-Government's Brief at 23.

[10] Brotherhood of R.R. Trainmen v. Baltimore & O. R. Co., 331 U.S. 519, 529 (1947).

[11] Id. at 528.

Circuit's, and other courts', view that the statute's concern is nonexistent instruments.

Most basically stated, the statute prohibits the use of "false or fictitious instruments, documents, or other items" that appear, represent, or purport to be "actual securities." The statute thus contemplates two universes of instruments: "false or fictitious" ones and "actual securities." "False" and "fictitious" have overlapping definitions. According to the American Heritage Dictionary, false and fictitious both can mean not real or imaginary.[12] Both words can also mean deceptive.[13] While the broader definition of deceptive lends some support to the government's argument, the choice of the word "actual" to modify security counsels otherwise. "Actual" means "existing in fact or reality." The use of "actual" thus focuses the inquiry on the character of the security–i.e., does this type of security exist. The statute, then, prohibits the use of a not real or imaginary type of instrument that purports to be an existing type of security.

The legislative history supports this construction. Senator D'Amato's floor statement explains that "fictitious instruments are not counterfeits of any existing negotiable instrument"; he lists as an example of such instruments "do-it-yourself kits that provide the materials and instructions . . . to produce phony money order [sic] and securities."[14]

The government cites a number of cases in support of a broader construction; however, none of those cases are on point as each involves situations where a fake instrument was used, the defendant had pleaded guilty

---

[12] False: "[c]ontrary to fact or truth"; "[n]ot real or natural; artificial." Fictitious: "[o]f, pertaining to, or characterized by fiction; imaginary."

[13] False: "[d]eliberately untrue"; "[i]ntentionally deceptive." Fictitious: "[a]dopted or assumed in order to deceive"; "[n]ot genuinely believed or felt; sham."

[14] 141 Cong. Rec. S 9533-34 (emphasis added).

and was not challenging the scope of § 514(a), or some combination thereof.[15] Moreover, the government's discussion of the case law fails to discuss the portion of Howick that draws the distinction between nonexistent and existent instruments.

The government's final argument is textual, but meritless. Section 514(b) incorporates definitions from § 513(c). Section 513(c) defines "forged" as "a document that purports to be genuine but is not because it has been falsely altered, completed, signed, or enhanced, or contains a false addition thereto or insertion therein, or is a combination of part of two or more genuine securities." The government asserts that the definition of "forged" in § 513(c) describes precisely what occurred in the scheme here, and thus pulls this scheme into § 514(a). The definition of "forged" does appear to describe what happened in the scheme here; however, § 514(a) nowhere mentions the word "forged," and § 514(b) specifically limits the definitions it incorporates to "any term used in this section."

The actions of Morganfield, Thomas, and their co-conspirators are plainly illegal; however, as the government's final argument regarding the definition of "forged" in § 513(c) suggests, the government charged Morganfield and Thomas under the wrong section. The checks in this case were, on their face, genuine.

---

[15] In United States v. Waalee, 133 Fed. Appx. 819 (3d Cir. 2005) (unpublished opinion), the defendant apparently made the $25 million "certified tender of payment" for which he was prosecuted; the court noted that the defendant "admitted on cross-examination that he took steps to produce a quality instrument." Id. at 823. In United States v. Granik, 386 F.3d 404 (2d Cir. 2004), the defendant pleaded guilty and the Second Circuit did not address the scope of § 514(a); the opinion only describes the instrument as a "counterfeited bank check." In United States v. Riley, 335 F.3d 919 (9th Cir. 2003), the defendant again pleaded guilty, and the only issue on appeal was the defendant's sentence. While the government makes much of the fact that the defendant in Riley stole genuine personal checks and cashed them, the defendant had also used those stolen checks as templates to create fake checks. Finally, in United States v. Mims, 13 Fed. Appx. 880 (10th Cir. 2001) (unpublished opinion), the defendant pleaded guilty, and the only issue on appeal was his sentence. And, the facts described by the Tenth Circuit indicate that the defendant in Mims had made at least some of the checks himself: "Police also discovered two laptop computers in the vehicle containing digital images of counterfeit checks. Police later discovered additional check counterfeiting equipment-namely, a word processor, a check program, and blank check stock . . . ." Id. at 881.

The checks were actual negotiable instruments that were issued by legitimate banks where actual checking accounts existed. Morganfield's and Thomas's subsequent actions may well have created "forged" or "counterfeit" obligations, but their actions did not turn otherwise "real" checks into a "nonexistent" type of security. This is not to say that a scheme that involves wholly fake "checks" necessarily falls outside § 514(a); we conclude only that, where the underlying instruments are facially genuine checks, § 514(a) is not applicable.

Accordingly, we reverse Morganfield's and Thomas's convictions on counts one and two.

## IV.

Morganfield next challenges his bank fraud convictions under 18 U.S.C. § 1344 and 18 U.S.C. § 2. We are concerned only with § 1344(2), as the district court only instructed the jury on it.[16] Section 1344(2) provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Morganfield raises three separate sufficiency of the evidence arguments: the government failed to prove that he obtained funds "by means of false or fraudulent pretenses, representations, or promises," that he had the intent to defraud financial institutions, and that any financial institution faced a risk of loss or civil liability.

Generally, when reviewing the sufficiency of the evidence, we "view the evidence in the light most favorable to the verdict and determine whether a

---

[16] See United States v. Medeles, 916 F.2d 195, 197-98 (5th Cir. 1990) (explaining that where the indictment did not specify under which clause of § 1344 defendant was charged with, and jury was only instructed as to one clause, the court would only consider the clause the jury was instructed on). The indictment contained language from §§ 1344 (1) and (2), but the jury instructions were limited to § 1344(2) and the government did not object.

rational jury could have found the elements of the offense beyond a reasonable doubt."[17]  However, where a defendant has failed to properly preserve his objections, our review is limited to plain error.[18]  Under the plain error standard, we reverse a conviction "only to avoid a manifest miscarriage of justice.  'Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking.'"[19]

The parties disagree over whether proper motions for judgment of acquittal were made at the close of the government's case and at the close of all of the evidence.[20]  We need not pause at this dispute.  Even if all required objections were made, the evidence is sufficient to sustain Morganfield's convictions.

### A.

The nub of Morganfield's first claim is that the presentation of a check that draws on an account which the defendant knows to contain insufficient funds is not a "false or fraudulent pretense, representation, or promise" under § 1344(2).  Morganfield relies on the Supreme Court's decision in Williams v. United States,[21] and this court's decision in United States v. Medeles;[22] however, his reliance on these cases is misplaced.

---

[17] United States v. Gutierrez-Farias, 294 F.3d 657, 660 (5th Cir. 2002), cert. denied, 537 U.S. 1114 (2003).

[18] United States v. Parker, 133 F.3d 322, 328 (5th Cir. 1998), cert. denied, 523 U.S. 1142 (1998).

[19] Id. (quoting United States v. Pierre, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc)) (citation omitted).

[20] See Fed. R. Crim. P. 29.

[21] 458 U.S. 279 (1982).

[22] 916 F.2d 195 (5th Cir. 1990).

10

In Williams, the Court considered a conviction under 18 U.S.C. § 1014, which prohibits the use of "any false statement or report . . . for the purpose of influencing in any way the action" of an enumerated financial institution, including federally insured banks. The defendant had engaged in a check-kiting scheme, whereby he had deposited several checks in various bank accounts knowing that the checking accounts had insufficient funds to cover the checks.[23] The government argued that presentation of a check with knowledge that the checking account had insufficient funds constituted a "false statement or report."[24] The Court, however, rejected this broad reading of the statute, explaining that,

> [a]lthough [the defendant] deposited several checks that were not supported by sufficient funds, that course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false."[25]

That is, "[e]ach check did not, in terms, make any representation as to the state of [defendant's] bank balance."[26] The Court went on to explain that "'false statement' is not a term that, in common usage, is often applied to characterize 'bad checks.'"[27] The trial evidence being limited to depositing the bad checks, the Court reversed the defendant's conviction.

---

[23] Williams, 458 U.S. at 280-82, 281 n.1.

[24] See id. at 286-87 ("If the drawer has insufficient funds in his account at the moment the check is presented, the Government continues, he effectively has made a "false statement" to the recipient.").

[25] Id. at 284.

[26] Id. at 284-85.

[27] Id. at 286.

Similarly, in Medeles, this court considered whether a check-kiting scheme could be prosecuted under former 18 U.S.C. § 1344(a)(2).[28] Medeles deposited a series of checks at various banks knowing that there were insufficient funds to cover the checks.[29] The appeal turned on whether depositing checks with the knowledge of insufficient funds constituted a "false or fraudulent pretenses, [or] representations,"[30] as "there was no evidence or allegation that [the defendant] made any [other] representation or pretense."[31] Following Williams, this court concluded that depositing of bad checks–even a series of bad checks–is not a representation: "If the deposit of a check is not an assertion about the balance in the account, then it seems to us that known insufficiency in the account when the check is deposited cannot of itself constitute the deposit a false or fraudulent pretense or representation."[32] Accordingly, this court reversed the defendant's conviction.

Had the scheme in the present case simply involved the presentation of checks for payment drawn on accounts with insufficient funds, the holdings in Williams and Medeles might have purchase. The scheme, however, was not so simple; rather, it was built on a series of misrepresentations before a bad check was ever presented for payment.

---

[28] Even though Congress amended § 1344 in 1989, this court has previously noted that cases considering former § 1344 are "equally relevant to the statute as it exists today." United States v. Briggs, 939 F.2d 222, 225 n. 6 (5th Cir. 1991), cert. denied, 506 U.S. 1067 (1993).

[29] Medeles, 916 F.2d at 196-97.

[30] Id. at 198.

[31] Id. at 197.

[32] Id. at 200; see also Briggs, 939 F.2d at 226 (concluding that the "bare act of instructing a bank to transfer funds is not a factual representation; thus, it cannot be a misrepresentation, a false representation, or any kind of representation").

For example, Douglas Jones testified that Morganfield directed him to obtain d/b/a certificates for nonexistent business entities, or shell corporations, because the banks would not open checking accounts without the certificates. Jones also testified that Morganfield provided him with identification to open bank accounts. In opening the checking accounts, at least two separate false or fraudulent representations were made to the banks: that the businesses existed, which they did not, and that the person opening the account was someone else.[33] Bank representatives testified that a d/b/a certificate was necessary to open a checking account, as was valid personal identification. The misrepresentations by Morganfield and his co-conspirators, then, directly influenced the banks' decisions to open checking accounts in the names of the shell companies.[34]

As this court and others have recognized, Williams and its progeny do not immunize every scheme that involves the use of insufficient-funds checks or an equivalent from federal prosecution.[35] A reasonable juror could conclude that Morganfield aided and abetted in the making of "false or fraudulent pretenses, representations, or promises" separate from the simple presentation of bad checks.

---

[33] Additionally, in preparing the checks, Morganfield and his co-conspirators made the checks payable to fake payees whose names appeared on bought or stolen identifications; typed the checks with the intent of making them look more legitimate; and, as Jones testified, he and Morganfield went to a printing company and had a signature stamp made in the name of "David Cobb" for the purpose of signing checks.

[34] See United States v. Campbell, 64 F.3d 967, 975 (5th Cir. 1995) ("Under § 1344(2), the defendant must make a material misrepresentation to the bank, which is defined as one having 'the natural tendency to influence, or was capable of influencing, the decision of the lending institution.'" (quoting United States v. Heath, 970 F.2d 1397, 1403 (5th Cir. 1992))).

[35] See, e.g., United States v. Hord, 6 F.3d 276, 285-86 (5th Cir. 1993), cert. denied, 511 U.S. 1036 (1994) (citing cases and explaining that "we are not alone among the federal circuits in applying Williams narrowly, to 'the simple presentation of a check drawn on an account with insufficient funds, without other evidence that the defendant made some false representation to the bank'" (quoting United States v. Falcone, 934 F.2d 1528, 1540 (11th Cir. 1991))); United States v. Bonnett, 877 F.2d 1450, 1455 (10th Cir. 1989) ("Williams clearly distinguishes between the use of a series of worthless checks to prove 'schemes to defraud' and the use of one of more worthless checks as 'false statements.'").

B.

Morganfield next argues that the government failed to prove that he had specific intent to defraud a financial institution. In particular, Morganfield asserts that the banks "were nothing more than incidental players in the check funds scheme";[36] rather, the true targets of the scheme were the grocery and convenience stores where the checks were cashed. And, according to Morganfield, there was no evidence proving that the use of nonexistent business names and false identifications to open checking accounts was done with the intent to defraud the banks, and that the accounts here were, at least temporarily, active accounts that could be drawn on.

This court previously explained that, under § 1344, "[t]he requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself."[37]

Morganfield relies solely upon the Fourth Circuit's decision in United States v. Orr.[38] In Orr, Eugene Elkins used false identification to open a checking account under the name "Eugene Rogers."[39] Elkins and Orr subsequently negotiated checks for merchandise in excess of the value of the checking account.[40] Orr was convicted of bank fraud under § 1344.[41] The Fourth Circuit reversed the conviction:

---

[36] Appellant-Morganfield's Brief at 33.

[37] United States v. McCauley, 253 F.3d 815, 819 (5th Cir. 2001) (quoting United States v. Doke, 171 F.3d 240, 243 (5th Cir. 1999)).

[38] 932 F.2d 330 (4th Cir. 1991).

[39] Id. at 331.

[40] Id.

[41] Id.

> No evidence has been produced to show that the use of the name "Rogers" as opposed to "Elkins" was done with intent to defraud the bank. The initial deposit was $1,000 in cash. The account was, albeit for a short time, an active account, traded upon in proper fashion until its funds ran out. Whether the account was in the name of Rogers, or Elkins, was not of significance to the giving of checks payable to certain payees and the return of such checks for reasons of insufficient funds.[42]

In sum, the court reasoned that Congress had not intended to create a national bad check law under § 1344.

The Fourth Circuit has, however, interpreted Orr narrowly. In United States v. Brandon[43]–where the defendant stole blank checks, forged the signatures, and used the checks to purchase items from merchants–the court explained that "[w]e view Orr as establishing merely that a routine bad check case does not come within the scope of § 1344 where the defendant passes to a merchant a check from an account for which the defendant is an authorized signatory and the drawee bank refuses to honor the check for lack of sufficient funds."[44]

The Fourth Circuit, along with other circuits, have rejected the argument that there can be no intent to defraud a bank when the principle victim or target is a third party merchant and not a bank.[45] We agree that the bank does not

---

[42] Id. at 332.

[43] 298 F.3d 307 (4th Cir. 2002).

[44] Id. at 313; see also United States v. Cavin, 39 F.3d 1299, 1308 (5th Cir. 1994) ("[T]he evidence reflects that [the defendant] did nothing more than write a bad check to accommodate a prospective client. That does not constitute bank fraud.").

[45] See, e.g., Brandon, 298 F.3d at 313 ("We conclude that the fact that the indictment does not charge that Brandon presented the forged checks directly to the banks does not make the indictment infirm. . . . An inherent part of this scheme was that the forged checks would eventually be presented to the drawee banks, exposing the banks to a risk of loss."); United States v. Crisci, 273 F.3d 235, 240 (2d Cir. 2001) ("A rational jury could find that [the defendant] intended to harm a bank when he cashed seventeen fraudulent checks with forged endorsements, even though defendant physically presented the forged checks to [a merchant] and not a bank. The jury could infer that inherent in [the

have to be the central target of the alleged scheme for there to be bank fraud liability.[46] Rather, in such cases where "the drawer has simply overdrawn the account, the government must present 'other facts evincing an intent to victimize the financial institution' to sustain a bank fraud charge under § 1344."[47]

The scheme here was, again, not a simple insufficient check funds scheme. Morganfield and his co-conspirators obtained d/b/a certificates in the names of nonexistent business entities precisely because they knew that the banks would not open checking accounts without the certificates. They also used false personal identifications in opening the checking accounts so as to not be personally connected to the checking accounts. Moreover, once they had the checks, they signed the checks in the names of nonexistent persons, often using a signature stamp to make the checks look more legitimate; they knew that the checking accounts had insufficient funds to cover the checks, and they did not deposit funds in the account to cover the difference; they bought and stole identifications and made the checks payable to the persons listed on those identifications. From this course of conduct the jury could rationally infer the requisite intent to defraud.[48]

---

defendant's] transaction with [the merchant] was the risk that the forged checks would be presented to a bank for payment."); United States v. Barrett, 178 F.3d 643, 648 (2d Cir. 1999) ("The bank need not be the immediate victim of the fraudulent scheme.").

[46] See United States v. Barakett, 994 F.2d 1107, 1111 (5th Cir. 1993), cert. denied, 510 U.S. 1049 (1994) ("While section 1344(1) prohibits only crimes directed at financial institutions, we have not held that the statute punishes only schemes directed solely at institutional victims.").

[47] Brandon, 298 F.3d at 313 (quoting United States v. Laljie, 184 F.3d 180, 190 (2d Cir. 1999)).

[48] See Brandon, 298 F.3d at 313 ("However, the presentation of a forged or altered instrument is evidence, in and of itself, of an intent to defraud a bank."); United States v. Moede, 48 F.3d 238, 241-42 (7th Cir. 1995) ("Circumstantial evidence to defraud includes such conduct as knowingly depositing a forged check, knowingly depositing an NSF check, knowingly writing checks on an inadequate account balance, violating bank rules, and providing falsified information on loan documents."); United States v. Saks, 964 F.2d 1514 (5th Cir. 1992), reh'g denied, 974 F.2d 1337 (5th Cir. 1992) (concluding there was an intent to defraud where the defendants "falsely represent[ed] on loan documents who the true recipients of the [] loans were and for what purposes the funds would be used"); United States v. Church, 888 F.2d 20, 23-24 (5th Cir. 1989) (sustaining attempted bank fraud conviction based on course

C.

Finally, Morganfield argues that the government failed to prove that any bank was at risk of civil liability or financial loss. Morganfield argues that, not only was there no evidence of risk of loss or civil liability, but that the "government's witness on risk of loss, Brenda King, indicated that the banks are not at a risk of financial loss, or civil liability, when checks with insufficient funds are presented to the bank by the businesses which cashed them."[49]

Bank fraud under § 1344 requires that the government "demonstrate that the defendants placed the financial institution at risk of civil liability or financial loss . . . . It is not necessary, however, for the government to prove that banks actually suffered civil liability or financial loss in order to obtain bank fraud convictions."[50] Additionally, "the government need not prove a substantial likelihood of risk of loss to support the convictions."[51]

Morganfield's argument relies upon the assumption that a bank will simply not honor a check where the checking account has insufficient funds, and therefore faces no risk of loss. However, testimony at trial contradicts this line of argument. The following exchange occurred during Morganfield's cross-examination of Brenda King:

> Q: . . . You talked about civil liability in a case, all right? If a person opens an account, puts money in the account and writes a check on the account, the bank has to honor the check, isn't that true? If there's money in the account?

---

of conduct beyond simply "furnishing insufficient funds drafts to the Bank").

[49] Appellant-Morganfield's Brief at 35.

[50] McCauley, 253 F.3d at 820.

[51] Id. Indeed, in United States v. Church, this court upheld an attempted bank fraud conviction where the defendant's "plan was no more likely to succeed than a request that the Bank exchange monopoly money for its face value in U.S. currency." 888 F.2d at 24.

A: If the funds are available, yes, sir.

Q: All right. If there is no money in the account, then it's the option of the bank to either cover the check, depending on the customer, right? Charge him a fee for honoring that check, right? And they assume that the customer will put money back into the account, isn't that true, to cover that check?

A: Correct.

Q: All right. Or they do what's called an NSF, non-sufficient fund, and the check is returned. The bank is not out any money, isn't that true?

A: Other than possible fees, yes.

Q: Well, possible fees? Well, the bank is really not out any money that was drawn against the bank on the check, correct?

A: That's correct.

King's testimony thus describes two separate scenarios when the bank receives a check drawn on an account with insufficient funds. The bank may pay the check despite the insufficient funds on the assumption that the customer will later make a deposit to cover the difference. Or, the bank may refuse to pay the check, in which case it faces no loss aside from NSF fees.

King's testimony undercuts the assumption Morganfield makes that a bank will simply not pay a check when the account has insufficient funds. A rational jury could infer that an inherent consequence of the check cashing scheme was that the bad checks would be presented to the bank by the merchants who accepted the checks. And, according to King's testimony, the

bank might honor the check even when an account had insufficient funds.[52] That possibility creates a sufficient risk of loss to the financial institution.[53]

## V.

Morganfield asserts that statements made by the prosecutor during rebuttal argument amounted to prosecutorial misconduct and require that his convictions be reversed. We disagree.

This court applies a two-step analysis when reviewing claims of prosecutorial misconduct.[54] The court must first decide whether the prosecutor made an improper remark.[55] The court evaluates the remark in light of the

---

[52] Morganfield argues that United States v. Odiodio, 244 F.3d 398 (5th Cir. 2001), cert. denied, 536 U.S. 914 (2002), where the defendants deposited a stolen check in a brokerage account and then transferred the funds to two different banks in Texas, forecloses a finding that the banks here faced any risk of loss. Morganfield reads Odiodio as standing for the proposition that the entity that initially deals with a forged or altered instrument bears the full risk of any loss under Texas law. First, Odiodio is not so categorical: "Where, as here, the FDIC insured banks never handled the fraudulent instrument, they had no risk of loss. The banks parted with no money of their own, and are not liable to replace any money lost [by the brokerage house]." Id. at 402 (emphasis added). King's testimony, therefore, indicates that this case is factually different. Second, Odiodio's description of Texas law is not exhaustive. It does not, for instance, consider protections for holders in due course, see Halliburton Energy Services, Inc. v. Fleet National Bank, 334 F. Supp. 2d 930, 937 n. 16 (S.D. Tex. 2004) (noting this), the final payment rule, see Texas Stadium Corp. v. Savings of America, 933 S.W.2d 616, 619 (Tex. App.–Dallas 1996) (discussing final payment rule), or the circumstances when presenting a forged instrument may not violate presentment warranties, see Aetna Life & Casualty Co. V. Hampton State Bank, 497 S.W.2d 80 (Tex. Civ. App.–Dallas 1973) (discussing presentment warranties and forgeries).

[53] See Church, 888 F.2d at 24 (upholding a conviction for attempted bank fraud where the defendant attempted to execute bank drafts and "there was no way that the Bank would simply hand over its money, inasmuch as [the defendant] had neither an account nor funds on deposit from which he claimed to draw"); see also United States v. Antonelli, No. 98-3434, 2000 WL 1205993, at *2 (7th Cir. Aug. 21, 2000) (unpublished opinion) ("[K]nowingly cashing bad checks can demonstrate an intent to defraud a bank because this behavior exposes the bank to a significant risk of financial loss."); United States v. Ahmed, No. 97-1312, 1998 WL 29861 (2d Cir. Jan. 27, 1998) (unpublished opinion) (finding a sufficient risk of loss under § 1344(1) conviction where there was testimony "that it was possible that the checks would have been paid even if improperly endorsed or written on a closed account").

[54] United States v. Insaulgarat, 378 F.3d 456, 461 (5th Cir. 2004), cert. denied, 543 U.S. 1013 (2004).

[55] Id.

context in which it is made.[56] If an improper remark was in fact made, the court must determine whether the remark "prejudiced the defendant's substantive rights."[57] In making that determination, the court considers "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt."[58] "The determinative question is whether the prosecutor's remark casts serious doubt on the correctness of the jury's verdict."[59]

The district court allowed Morganfield personally to address the jury during closing arguments. During the course of his remarks, Morganfield held up a photograph of a child and stated that "my life is in your hands and stuff, I just wanted to let you know if you have children, that's my daughter. She ain't but five years old. She's missing her daddy. And this is a plea from my heart to get you in tune . . . ." Later in his remarks Morganfield added, "Well, that's what I'd like for today to happen, that the light shine in to each and every one of your hearts and realize that this might be your five-year-old kid that you need to get home to." Finally, Morganfield said, "Anyway, my child is waiting on me. God bless you. I hope you make the right decision."

The prosecution did not object during Morganfield's remarks, but requested a bench conference after Morganfield's attorney finished his closing remarks. During the bench conference, the prosecutor alleged that Morganfield's comments regarding his child were "factually untrue or inconsistent with the prior statement that he had made." The prosecutor based

---

[56] Id.

[57] Id. (quoting United States v. Munoz, 150 F.3d 104, 415 (5th Cir. 1998)).

[58] United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir. 1995).

[59] Insaulgarat, 378 F.3d at 461 (quoting United States v. Iredia, 866 F.2d 114, 117 (5th Cir. 1989)).

his claim on a pretrial report, which had not been introduced into evidence, that stated that "defendant noted he has never been married nor has he fathered children to his knowledge." The prosecutor requested the opportunity to correct the misstatement. Morganfield's counsel objected, but the judge overruled the objection. Morganfield's counsel also objected to the court's offer to give a curative instruction.

During rebuttal, the prosecutor stated, "And when you consider him, consider his closing summation to you, because I will suggest to you, ladies and gentlemen, that the photographs of the children that he held before you were props." Morganfield and his counsel both objected, but the court overruled the objections. The prosecutor then began to read from the pretrial report. Morganfield's counsel again objected, but the court overruled the objection explaining that Morganfield raised the issue in his remarks. The judge advised the jury that "neither document is in evidence, the photograph is not in evidence, no report is in evidence. But, more importantly, remember what I told you that closing arguments by the lawyers or those who make argument is not evidence." The prosecutor then read the passage from the report.

Assuming arguendo that the prosecutor's remarks were improper, it casts no doubt on the verdict. Beginning with the first factor, the magnitude of the statement's prejudice, the factual dispute over whether or not Morganfield had children is ancillary to the issues in the case; his status as a father does not relate to any operative facts, nor does it relate to any of the elements of the charged crime. Any prejudicial effect the prosecutor's comment had related to Morganfield's credibility. While this factor is potentially troubling, especially because Morganfield elected to testify, the strength of the evidence of Morganfield's guilt–the third factor–is substantial. The conspiracy involved numerous individuals, many of whom testified as to Morganfield's central role

in the conspiracy. And, there was extensive documentary evidence of the check cashing scheme.

Finally, the district court advised the jury before closing arguments began that closing arguments were not evidence, and the judge specifically reiterated the advisement in reference to Morganfield's statements regarding the purported child and the prosecutor's rebuttal argument.[60] "We presume that the jury follows the instructions of the trial court unless there is an 'overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating.'"[61]

We are also mindful that "deference is due to the district court's determination of whether [the challenged] arguments are prejudicial and inflammatory."[62] Morganfield entered multiple objections to the prosecutor's remarks, both during the bench conference and during the prosecutor's actual rebuttal. The trial court overruled each objection.

Considering the strength of the evidence of Morganfield's guilt and the district judge's instructions, the prosecutor's comments, even if improper, do not cast substantial doubt on the jury's verdict.[63]

VI.

---

[60] See, e.g., United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999), cert. denied, 529 U.S. 1119 (2000) ("[T]he cautionary instructions given to the jury were sufficient to negate any prejudicial effects the statements may have had."); United States v. Shackelford, 709 F.2d 911, 913-14 (5th Cir. 1983), cert. denied, 464 U.S. 899 (1983) (noting that "prompt and strong instructions to the jury" can avoid reversible error).

[61] Tomblin, 46 F.3d at 1390 (quoting United States v. Barksdale-Contreras, 972 F.2d 111, 116 (5th Cir. 1992)).

[62] United States v. Williams, 822 F.2d 512, 518 (5th Cir. 1987), reh'g denied, 808 F.2d 772 (5th Cir. 1987).

[63] See id. (concluding that the weight of the evidence and trial judge's instructions "dissipated the potential prejudice of the prosecutor's statements").

Accordingly, we AFFIRM in part, REVERSE in part, VACATE Morganfield's sentence, and REMAND for resentencing.